## THE FRANKMERE.

### (District Court, E. D. Virginia. February 12, 1920.)

### No. 2034.

SHIPPING ⬡⟿51, 58(1)—EFFECT ON CHARTER OF REQUISITIONING FOR WAR PUR-
POSES.

   The requisitioning and taking over by the British government early
   in the war of a British ship, then under a three-year time charter con-
   taining the usual restraint of princes clause, *held* to terminate the
   charter, and the charterer *held* not entitled to damages for breach of
   charter, nor to recover the excess of hire received by the owner from the
   British government over the charter rate.

In Admiralty. Suit by the Gans Steamship Line against the steam-
ship Frankmere and the Palace Shipping Company, Limited, as claim-
ant. Decree for respondents.

Haight, Sandford & Smith, Edward Sandford, and Warton Poor, all
of New York City, and Hughes, Little & Seawell, of Norfolk, Va., for
libelant.

Kirlin, Woolsey & Hickox and John M. Woolsey, all of New York
City, and Hughes, Vandeventer & Eggleston, of Norfolk, Va., for re-
spondents.

Frederic R. Coudert and Howard Thayer Kingsbury, both of New
York City, for British Embassy, as amici curiæ.

WADDILL, District Judge. The libel in this case was filed to
recover damages for alleged breach of a charter party entered into
between the Palace Steamship Company, Limited, owner of the British
steamship Frankmere, and the libelant, under the following circum-
stances:

On the 28th day of October, 1913, in the city of New York, the
Palace Steamship Company chartered under the ordinary time charter,
for a period of 3 years from the delivery of the steamer, at the
rate of £1,600 per month, less 2½ per cent. address commis-
sions, making the net amount payable by the charterers for its use the
sum of £1,560 per month. The steamship was delivered on the 30th
of November, 1913, and the charter party provided that the charterers
should have an option of 45 days more or 45 days less than the 3-
year period in order to round up voyages. The flat 3-year period ex-
pired November 30, 1916, and under the overlap of the original char-
ter party the charterers would have had the right, under their option,
to keep the vessel 45 days longer, as above mentioned. The ship en-
tered at once in the transatlantic trade on November 30, 1913, and so
continued from that date until the 4th day of May, 1915, when she
was requisitioned by the British admiralty. On the 7th day of May,
1915, upon coming out of dry dock at Genoa, over the protest of the
libelant, duly made to the respondent, the ship was formally taken
possession of by the British government, and thenceforth continuously

⬡⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

used by it in the then pending war, for a period subsequent to the expiration of the life of the charter.

The libelant claims, in effect, that the ship was taken possession of by the government, with the assent of the owner, and over the libelant's protest, and that as a result heavy damages were sustained by the libelant, the charter hire of vessels having immensely increased after the charter party was entered into, and that for the 20 months and 6 days that it was deprived of the use of the ship, it would have received a charter rate of £6,397 per month, and was accordingly damaged to the extent of £4,797 per month, or £96,896 sterling, or its equivalent in United States money of $465,110, at least, and for the recovery of which this libel was filed. Libelant moreover urges in argument that during the remainder of the charter period, after the requisition by the government, the respondent operated the ship under the requisition for the benefit of the libelant, subject to the payment of the regular charter hire, which libelant tendered to the respondent; its claim being that the difference between said amount and that paid by the government belonged to the charterer, and was the least amount for which a recovery should be had.

The charter party in question contained the usual "restraint of princes" clause, as follows:

"20. The act of God, the king's enemies, epidemics, pirates, ice, blockade of rivers, robbers by land or sea, restraint of Princes, rulers or people, perils of the sea, collisions, strandings, patent defects in the hull, boilers, machinery or appurtenances, loss or damage from machinery, boilers, or steam, or from explosions, heat or fire on board, in the hulk of the craft, or shore, jettison, barratry, any act, neglect or default whatsoever of pilots, master or crew in the management or navigation of the ship, and all and every danger and accident of the sea, rivers and canals or navigation of whatever nature or kind are excepted throughout this charter."

The question presented turns upon (a) whether or not the ship was commandeered, as contemplated by this provision of the charter party; and (b) what effect such commandeering had upon the contractual relation of the parties.

Considering the first proposition, the suggestion is made that the vessel was taken by the British government with the consent, if not the connivance, of the owners; that the commandeering was not legally made, and that the ship could not have been lawfully taken at Genoa, outside of the dominion of the British government, and within the 3-mile limit of the Italian coast. Neither of these positions appear to the court to be well taken. In the first place, while doubtless, having regard to the hazardous exigencies of the existing war period, the owners may have been willing that their ship should be commandeered, still the testimony does not warrant the inference that anything improper was done in this respect on their part, further than arose from their surrendering the vessel when demanded by the constituted authorities. At the time, its resistance, either from a business, sensible, or a patriotic standpoint, could not have been thought of for a moment.

The taking of the vessel by the government, under the facts and circumstances of this case, seems to have been in all respects lawful

and complete, without any bad faith on the part of the owner, and the same occurred at a time when there was every indication that the commandeering was for the period at least covered by the life of the charter, and which the result proved. As to the taking of the vessel at Genoa, while technically the government might not have been able to enforce its decrees and orders as long as the ship remained in harbor there, still she could never have left there, without, upon reaching the high seas, being immediately seized and taken. Had this course been pursued, the charterer's interest would not have been promoted, and the owners, in every probability, would have received nothing whatever from the use of the ship.

Considering the effect of the commandeering upon the rights of the parties under the charter, in the light of the excepting vis major clause therein, and whether there was a frustration of the contract, it may be said that the same is not free from doubt, and that much contrariety of opinion exists in the authorities on the subject. Two recent decisions in cases of breach of charters party, arising during the recent war and under circumstances substantially as here, one by Judge Learned Hand, of the Southern district of New York, in the case of Earn Line S. S. Co. v. Sutherland S. S. Co., Ltd., 254 Fed. 126, and the other by Judge Rose, of the Maryland district, in The Isle of Mull, 257 Fed. 798, have been recently rendered. The courts are directly at variance; Judge Rose holding that the charterer is entitled to the advanced hire during the life of the charter, and Judge Learned Hand taking the contrary view.

To these two opinions, as well as to the authorities therein cited, special reference is made, as containing great learning and throwing much light upon the question. Judge Rose, in an exceedingly vigorous and able opinion, strongly adheres to the view that pending the life of the contract, any advance in rates arising from the taking of the ship, should belong to the charterer, as distinguished from the owner. The equity of this position cannot well be gainsaid, certainly in many cases. Having relation, however, to the status of the parties, the court cannot accept this view. Their rights should be determined in the light of their relation under the contract, having regard as well to what might have taken place thereunder, assuming the view contended for to be correct, as to what actually occurred. The respondent was the owner of the vessel; the libelant had no right to or interest in her, save as arose under the terms of the contract. Anything that lawfully put an end to the contract terminated the libelant's rights thereunder, and such an event was, in terms, contemplated and provided for in the contract. Each party, in entering into it, was anxious to have just such a vis major clause as this one contained, looking to possibilities or eventualities which might arise thereafter.

The wisdom, if not the necessity, of such a clause all recognize, and was strikingly illustrated here. Before half of the term of the contract had expired, the most frightful war theretofore known had broken out, in which much of the world was engaged, and especially the country of the shipowner, its very existence being seriously imperiled,

and the restraint of princes clause, providing for the termination and annulment of the contract in such contingency, became acutely of the essence of the contract. The state of the war at that time, and the condition of the country and of the world, made it manifest to both parties that the commandeering would continue long past the life of the contract. This it actually did, and the contract was thereby frustrated when the government took possession of the ship, and the rights of the charterer were absolutely ended and terminated, and those of the owner, subject, however, to the paramount power of the government to use the ship, without consulting the desire of the owner, revived, as though the charter had never been entered into. It so happens that the government did pay a much higher requisition rate than the owner was to receive under the charter party, but that was a mere coincidence. It might just as readily have been less, or indeed nothing at all; and, as seen, the owner was dispossessed of his property without his consent, or consultation with him as to its worth or value, and it should not, because it happened to be more than was actually received from the charterer, be required to give the excess to one whose interest therein, or contractual relations therewith, had been terminated.

No one would say, had the government paid less hire than the owner had been receiving, that the charterer could have been held for the difference. Nor can it be successfully claimed that, if the commandeering had not continued during the life of the contract, the charterer could either have been required to complete the contract for the unexpired term or pay the owner the hire therein provided for. The charterer's rights in the res existed only by virtue of the charter party. One whose rights have been terminated, as here, cannot be heard to complain of any inequity or injustice that arises. The happening of the very thing that occurred was anticipated in the making of the contract. In this instance, charter rates had increased; but had they decreased, and the government had chosen to seize the vessel, as it did here, the charterer would have been the only person that could have protected itself from the disastrous consequences of such a situation, as it might have gone upon the market and hired tonnage at a much cheaper rate; whereas the owners would have been entirely at the mercy of the government, in what it chose to pay.

No general discussion or citation of authorities will be entered upon, save to refer to the decisions of Judges Hand and Rose, supra, and to the cases cited by them; the court's opinion being, under the circumstances here, that the charter party was frustrated, and the rights of the libelant thereunder terminated.

The court's conclusion is that the libelant is not entitled to recover in this case, whether its claim be treated as for damages generally for breach of the contract, or specifically for the excess paid by the government to the owner, over and above the sum the respondent would have received from the libelant, and accordingly the libel should be dismissed.