## OMNIA COMMERCIAL COMPANY, INC., *v.* UNITED STATES.

### APPEAL FROM THE COURT OF CLAIMS.

No. 229. Argued March 1, 1923.—Decided April 9, 1923.

1. A valuable contract right is property within the meaning of the Fifth Amendment, and when taken for public use must be paid for by the Government; but when it is lost or injured as a consequence of lawful governmental action not a taking, the law affords no remedy. P. 508.
2. When the Government, for war purposes, requisitioned the entire production of a steel manufacturer, rendering impossible and unlawful of performance an outstanding contract between the manufacturer and a customer, the customer's rights were not taken by the Government, but frustrated by its lawful action. P. 511.

56 Ct. Clms. 392, affirmed.

APPEAL from a judgment of the Court of Claims dismissing a petition on demurrer.

*Mr. George Maurice Morris,* with whom *Mr. Frederick N. Watriss, Mr. Melvin G. Palliser* and *Mr. William S. Thompson* were on the briefs, for appellant.

In the year 1916, five associated individuals owned machinery, mill equipment, structural steel, real property, water and rail rights, all in condition for the erection and operation of a steel plate mill. After months of negotiations, the associates sold, in May, 1917, all their rights in these assets to the Allegheny Steel Company of Pittsburgh, Pennsylvania. The agreed value of these properties was $3,705,000. The consideration moving from the Allegheny Steel Company was to be paid, $500,000 in cash and the remainder in 58,000 tons of steel plate to be delivered to the associates' order in equal monthly instalments during 1918 upon the payment by the associates of a price $3,205,000, below the minimum market value of such plates.

The associates then formed two corporations in which they were the sole stockholders, officers and directors. These corporations succeeded to the rights of the associates in their contract with the Allegheny Steel Company for 1918. To the appellant corporation was conveyed the right to receive 18,000 tons of the total 58,000 tons.

The contract between the appellant and the Allegheny Steel Company required the posting of letters of credit in favor of the Allegheny Steel Company. The appellant posted $2,370,000 in such letters in due season and form. These letters of credit enabled the Allegheny Steel Company to procure and it did procure the raw materials necessary to perform its contract with the appellant. The appellant then sold the entire 18,000 tons of plate due under its contract to responsible parties who established satisfactory credits.

By reason of the subsequent taking by the United States, the loss of the appellant was $990,000. This was the value of the consideration paid by the assignors of the appellant to the Allegheny Steel Company for the appellant's contract with that company.

Rights under a lawful and binding contract constitute property in the holder and are property within the Fifth Amendment.

By reason of its contract, the appellant acquired, in addition to those rights common to all purchasers under a contract, the right to receive the finished product; the right to specify, within the capacity of the seller's mills, the gauge and size of the steel plate rolled; the right to inspect the product as it should be manufactured; the right to pay for the plate delivered at the times and in the manner provided; the right to specify the place of delivery; and, finally and most important, the right to have the plate delivered during the year 1918 in approximately equal monthly quantities. To the appellant was assigned 18/58 of the expected entire production of the Allegheny Steel Company for the year 1918.

It should be apparent that, by reason of its contracts with the assignors of the appellants, the Allegheny Steel Company was richer in equipment capacity and credit to the extent of $3,200,000. By reason of the preliminary performance by the appellant of its contract with the Allegheny Steel Company the latter had purchased sufficient raw materials to manufacture the steel plate for the appellant. The Court is as capable as the appellant of visioning the material benefit these performances by the appellant and its assignors brought to the United States when the officers requisitioned the producing capacity of the Allegheny Steel Company's plant.

These benefits, which the appellant had purchased and the returns from which it was due to receive from the Allegheny Steel Company, were as verily taken by the United States as though the officers of the United States had caused to be substituted in the appellant's contract with the Steel Company the name of the United States wherever there appeared the name of the appellant.

Not only, however, did the officers of the United States take the benefits for which the appellant had paid, but they destroyed whatever benefit there was in the rights which the appellant had in its contract, saving only the right to be fairly compensated for its loss. From the appellant was taken the use, possession and disposal of the steel plates it had a right to receive from the Steel Company and which it had already sold. With that went the entire material benefit of all the appellant's rights under its contract. What had been valuable, worth nearly a million dollars, was gone; taken for the public use; lawfully taken, yes, but lawfully compensated for, no.

In practically every case where the taking of intangible rights has been alleged, the plea has been made by the sovereign power that it actually took nothing from the owner; often that it received no benefit from the owner's loss. A good deal of loose thinking has been cloaked

under the charge that the injuries were "consequential." These arguments, or their equivalent, were raised in the two leading cases of *Pumpelly* v. *Green Bay & Mississippi Canal Co.*, 13 Wall. 166, and *United States* v. *Lynah*, 188 U. S. 445. Yet the decisions in those cases stand for the proposition that, where real property, while not actually reduced to possession by the Government, has necessarily had its actual usefulness destroyed by reason of the exercise of the power of eminent domain, a taking has resulted and compensation is due. These conclusions are built upon the principle that, where the sovereign power considers the general result to be accomplished is for the public good, the interest of the individual which must be sacrificed for the community purpose is to be measured, not by the direct value to the public, but by the value to the individual of the right taken. This, it is submitted, is the universal doctrine.

*Monongahela Navigation Co.* v. *United States*, 148 U. S. 312, announced the proposition that, where an exercise of the sovereign power of appropriation at the same time necessarily destroys the value to the owner of an intangible contract right which depends for its value upon the free use, possession and disposition of the tangible property upon which it is founded, there also we have a taking of property for which compensation must be made.

In *Long Island Water Supply Co.* v. *Brooklyn*, 166 U. S. 685, a water company was possessed of its physical equipment, franchises to operate, and in addition a contract with the city to supply the city with water. See also Award of the Tribunal of Arbitration between the United States of America and the Kingdom of Norway, under the special agreement of June 30, 1921, p. 31; *Cornwall* v. *Louisville & Nashville R. R. Co.*, 87 Ky. 72; *Trustees* v. *Atlanta*, 93 Ga. 468; *Cincinnati* v. *Louisville & Nashville R. R. Co.*, 223 U. S. 390; *West River Bridge* v. *Dix*, 6 How. 507; *Richmond, etc., R. R. Co.* v. *Louisa*

*R. R. Co.,* 13 How. 71; *Greenwood* v. *Union Freight R. R. Co.,* 105 U. S. 13.

Where A is the owner and B the lessee, an appropriation by the State of A's property is a taking of B's property and B must be compensated as well as A. *Kohl* v. *United States,* 91 U. S. 367; *United States* v. *Inlots,* Fed. Case No. 15,441a; *Matter of City of New York,* 120 App. Div. 700. A lessee is entitled to compensation when by the appropriation of the freehold his right of renewal is destroyed. *Matter of City of New York,* 118 App. Div. 865, affd. 189 N. Y. 508. Here we have a value in the lessee which is over and above the total value of the property; and no attention paid the city's contention that it does not seek to use the lessee's property.

An even closer analogy is to be found in *Meade* v. *United States,* 2 Ct. Clms. 224; *Gray* v. *United States,* 21 Ct. Clms. 340; and *Cushing* v. *United States,* 22 Ct. Clms. 1. In these cases the claimants were the owners of valid claims against foreign governments which this Government surrendered by treaties. See also *Morris Canal & Banking Corporation* v. *Townsend,* 24 Barb. 658.

The facts are that the United States seized the appellant's rights to priority in a definitely assigned portion of the entire manufacturing capacity of the Allegheny Steel Company for the year 1918, and then devoted that capacity to producing the very same plates of steel for which the appellant had contracted, and produced this steel from the very raw material which had been purchased by the Steel Company for the performance of the appellant's contract,—a purchase which had been made possible by reason of the appellant's performance of its initial obligation under the contract. We stand upon the proposition that the United States, by reason of prohibiting the performance of the appellant's contract with the Steel Company and devoting the manufacturing capacity of the plant for 1918 to the purposes of the United States,

took for the public use the property of the appellant; that the United States received a benefit from this property of the appellant; and that, whether or not it received such benefit, the destruction of the appellant's rights by the action of the United States constituted a taking, within the meaning of the Fifth Amendment, and compensation should be made therefor.

If the property right existed, and if it was taken for public use, then, on the authority of the following cases, the United States is under an implied contract to pay reasonable compensation. *United States* v. *Lynah,* 188 U. S. 445; *United States* v. *Great Falls Mfg. Co.,* 112 U. S. 645; *Hollister* v. *Benedict & Burnham Mfg. Co.,* 113 U. S. 59; *United States* v. *Palmer,* 128 U. S. 262; *United States* v. *Berdan Fire-Arms Mfg. Co.,* 156 U. S. 552.

*Mr. Assistant Attorney General Riter,* with whom *Mr. Solicitor General Beck* and *Mr. H. L. Underwood* were on the brief, for the United States.

MR. JUSTICE SUTHERLAND delivered the opinion of the Court.

The appellant, on May 19, 1917, by assignment, became the owner of a contract, by which it acquired the right to purchase a large quantity of steel plate from the Allegheny Steel Company, of Pittsburgh, at a price under the market. The contract was of great value and if carried out would have produced large profits.

In October, 1917, before any deliveries had been made, the United States Government requisitioned the Steel Company's entire production of steel plate for the year 1918, and directed that company not to comply with the terms of appellant's contract, declaring that if an attempt was made to do so the entire plant of the Steel Company would be taken over and operated for the public use.

Appellant brought an action in the Court of Claims alleging, in addition to the foregoing, that by the orders

of the Government the performance of the contract by the Steel Company had been rendered unlawful and impossible; that the effect was to take for the public use appellant's right of priority to the steel plate expected to be produced by the Steel Company and thereby appropriate for public use appellant's property in the contract. As a result it alleged that it had incurred losses in a large sum which it sought to recover, as just compensation, by virtue of Article V of the Constitution. To this petition the United States interposed a demurrer, which was sustained and the petition dismissed. From this judgment the case comes here by appeal.

A question is raised as to the statutory authority of the officer, who made the order of requisition and gave the directions respecting non-compliance with the contract, to bind the Government, but, for the purposes of the case, we assume he was authorized, as he could have been under 39 Stat. 1193, c. 180; or 40 Stat. 182–183, c. 29. We also pass, without deciding, a contention challenging the sufficiency of the complaint and come to the case on the merits.

The contract in question was property within the meaning of the Fifth Amendment, *Long Island Water Supply Co.* v. *Brooklyn,* 166 U. S. 685, 690; *Cincinnati* v. *Louisville & Nashville R. R. Co.,* 223 U. S. 390, 400, and if taken for public use the Government would be liable. But destruction of, or injury to, property is frequently accomplished without a " taking " in the constitutional sense. To prevent the spreading of a fire, property may be destroyed without compensation to the owner, *Bowditch* v. *Boston,* 101 U. S. 16, 18; a doctrine perhaps to some extent resting on tradition. *Pennsylvania Coal Co.* v. *Mahon,* 260 U. S. 393. There are many laws and governmental operations which injuriously affect the value of or destroy property—for example, restrictions upon the height or character of buildings, destruction of diseased

cattle, trees, etc., to prevent contagion—but for which no remedy is afforded. Contracts in this respect do not differ from other kinds of property. See *Calhoun* v. *Massie,* 253 U. S. 170, where an act of Congress invalidating contracts made with attorneys for compensation exceeding a certain percentage for the prosecution of claims against the Government, was sustained, although it had the effect of putting an end to an existing contract. This Court said (pp. 175–176):

"An appropriate exercise by a State of its police power is consistent with the Fourteenth Amendment, although it results in serious depreciation of property values; and the United States may, consistently with the Fifth Amendment, impose for a permitted purpose, restrictions upon property which produce like results. *Lottery Case,* 188 U. S. 321, 357; *Hipolite Egg Co.* v. *United States,* 220 U. S. 45, 58; *Hoke* v. *United States,* 227 U. S. 308, 323; *Hamilton* v. *Kentucky Distilleries & Warehouse Co.,* 251 U. S. 146. The sovereign right of the Government is not less because the property affected happens to be a contract. *Louisville & Nashville R. R. Co.* v. *Mottley,* 219 U. S. 467, 484; *Union Dry Goods Co.* v. *Georgia Public Service Corporation,* 248 U. S. 372."

In *Louisville & Nashville R. R. Co.* v. *Mottley,* 219 U. S. 467, it was held that an act of Congress, prohibiting the issuance of free transportation by interstate common carriers which invalidated a contract for transportation previously entered into and valid when made, did not have the effect of taking private property without compensation. The Court, speaking through Mr. Justice Harlan, said (p. 484):

"It is not determinative of the present question that the commerce act as now construed will render the contract of no value for the purposes for which it was made. In *Knox* v. *Lee,* 12 Wall. 457, above cited, the court, refer-

ring to the Fifth Amendment, which forbids the taking of private property for public use without just compensation or due process of law, said: ' That provision has always been understood as referring only to a direct appropriation, and not to consequential injuries resulting from the exercise of lawful power. It has never been supposed to have any bearing upon or to inhibit laws that indirectly work harm and loss to individuals. A new tariff, an embargo, a draft, or a war, may inevitably bring upon individuals great losses; may, indeed, render valuable property almost valueless. They may destroy the worth of contracts.' "

The conclusion to be drawn from these and other cases which might be cited is, that for consequential loss or injury resulting from lawful governmental action, the law affords no remedy. The character of the power exercised is not material. *Chicago, Burlington & Quincy Ry. Co. v. Drainage Commissioners,* 200 U. S. 561, 583–585, 592–593. If, under any power, a contract or other property is *taken* for public use, the Government is liable; but if injured or destroyed by lawful action, without a taking, the Government is not liable. What was here requisitioned was the future product of the Steel Company, and, since this product in the absence of governmental interference would have been delivered in fulfillment of the contract, the contention seems to be that the contract was so far identified with it that the taking of the former, *ipso facto,* took the latter. This, however, is to confound the contract with its subject-matter. The essence of every executory contract is the obligation which the law imposes upon the parties to perform it. " It [the contract] may be defined to be a transaction between two or more persons, in which each party comes under an obligation to the other, and each reciprocally acquires a right to whatever is promised by the other." *Dartmouth College v. Woodward,* 4 Wheat. 629, 656. Plainly, here there was

no acquisition of the obligation or the right to enforce it. If the Steel Company had failed to comply with the requisition, what would have been the remedy? Not en- forcement of the contract but enforcement of the statute. If the Government had failed to pay for what it got what would have been the right of the Steel Company? Not to the price fixed by the contract but to the just compensation guaranteed by the Constitution.

In exercising the power to requisition, the Government dealt only with the Steel Company, which company thereupon became liable to deliver its product to the Government, by virtue of the statute and in response to the order. As a result of this lawful governmental action the performance of the contract was rendered impossible. It was not appropriated but ended.

Parties and a subject-matter are necessary to the existence of a contract, but neither constitutes any part of it—the contract consists in the agreement and obligation to perform. If one makes a contract for the personal services of another or for the sale and delivery of property, the Government, by drafting one of the parties into the army, or by requisitioning the subject-matter, does not thereby take the contract. In *Marshall* v. *Glanvill*, [1917], 2 K. B. 87, the plaintiff had been employed by the defendants upon a contract of service. While the agreement was in force the former was called into the military service. It was held that this put an end to the contract. The court said:

"Here the parties clearly made their bargain on the footing that it should continue lawful for the plaintiff to render and for the defendants to accept his services. The rendering and acceptance of these services ceased to be lawful in July, 1916, and thereupon the bargain came to an end."

The American and English cases all agree that the result is the same where the subject-matter of the contract

is requisitioned. *Texas Co.* v. *Hogarth Shipping Co.,* 256 U. S. 619, 629-631; *The Claveresk,* 264 Fed. 276, 282-284; *The Frankmere,* 262 Fed. 819, 822; *In re Shipton, Anderson & Co.* [1915], 3 K. B. 676; *Steamship Co.* v. *Le Nickel Societé Anonyme,* 8 British Ruling Cases, 546; *Bank Line, Limited,* v. *Arthur Capel & Co.* [1919], A. C. 435, 445.

In *The Frankmere, supra,* where a ship under charter was requisitioned by the British Government, the court said that

". . . the contract was thereby frustrated when the government took possession of the ship, and the rights of the charterer were absolutely ended and terminated, and those of the owner, subject, however, to the paramount power of the government to use the ship, without consulting the desire of the owner, revived, as though the charter had never been entered into."

In *In re Shipton, Anderson & Co., supra,* a parcel of wheat then lying in a warehouse was sold, for future payment and delivery. The wheat was subsequently requisitioned by the English Government, and, in consequence, the sellers were unable to deliver. A claim for damages was put forward against the sellers, but the Court of King's Bench Division held that they were not liable, upon the ground that performance had become impossible without their fault. Darling, Justice, agreeing with the opinion of Lord Reading, said (pp. 683-684):

"If one contracts to do what is then illegal, the contract itself is altogether bad. If after the contract has been made it cannot be performed without what is illegal being done, there is no obligation to perform it. In the one case the making of the contract, in the other case the performance of it, is against public policy. It must be here presumed that the Crown acted legally, and there is no contention to the contrary. We are in a state of war; that is notorious. The subject-matter of this contract

has been seized by the State acting for the general good. Salus populi suprema lex is a good maxim, and the enforcement of that essential law gives no right of action to whomsoever may be injured by it."

In the present case the effect of the requisition was to bring the contract to an end, not to keep it alive for the use of the Government.

The Government took over during the war railroads, steel mills, ship yards, telephone and telegraph lines, the capacity output of factories and other producing activities. If appellant's contention is sound the Government thereby took and became liable to pay for an appalling number of existing contracts for future service or delivery, the performance of which its action made impossible. This is inadmissible. Frustration and appropriation are essentially different things.

There is nothing in *Monongahela Navigation Co.* v. *United States*, 148 U. S. 312, or in the other cases cited by appellant, which in any way conflicts with what we have said.

In the *Monongahela Case* the property which was taken was a lock and dam, built by the company, pursuant to the invitation of the United States and the State of Pennsylvania, the latter, in consideration, giving the company a franchise to exact tolls. The franchise, therefore, was not merely a contract in respect of the property taken, but was an integral part of it, and this Court (p. 329) said:

"So, before this property can be taken away from its owners, the whole value must be paid; and the value depends largely upon the productiveness of the property, the franchise to take tolls."

The lock and dam constituted, in effect, a going concern, whose value was of course affected by what it would produce. Moreover, the case rested primarily upon the doctrine of estoppel, as this Court has in several cases since

pointed out. *Greenleaf Lumber Co.* v. *Garrison,* 237 U. S. 251, 264; *Lewis Blue Point Oyster Co.* v. *Briggs,* 229 U. S. 82.

In *Long Island Water Supply Co.* v. *Brooklyn,* 166 U. S. 685, the statute providing for condemnation expressly included contracts, and these were in fact taken and compensation therefor specifically allowed. This was pointed out in the opinion of this Court (p. 691):

" In other words, the condemnation proceedings did not repudiate the contract but appropriated it and fixed its value."

We have examined the other cases relied upon but find nothing to justify a conclusion other than that which we have reached.

The judgment of the court below is

*Affirmed.*