Graham, Judffe,
delivered the opinion of the court:
The plaintiff is claiming damages as just compensation for the taking of its property by the defendant for public use. The alleged taking, stating it in a general way, is the action of the defendant in preventing it from getting water to generate its power for its plant from the canal of the Niagara Falls Power Company under leases and claimed rights from the latter company. The defendant defends upon the grounds:
(1) (a) That there was no taking of the plaintiff’s property;
*433 (b) That the water and its consequent power, if taken, were not private property, but were under the control of the United States Government;
(c) That if it was taken, it was not for a public use, that the United States did not use it, and it was distributed to private industries which were aiding in the • prosecution of the war;
(2) That if the plaintiif was damaged the damage was consequential, under the Omnia Commercial Co. case, 261 U. S. 502, and its injury was incidental to the exercise of sovereign power, as the Government, if it requisitioned, requisitioned only the product of the Niagara Falls Power Company;
(3) That the use of the water in the Niagara River for power purposes is controlled by stipulation in a treaty between the United States and Great Britain ratified May 5, 1910, prior to the action herein complained of, and that the plaintiff is barred under section 153 of the Judicial Code;
(4) That whatever was secured by the Government from the Niagara Falls Power Company was secured by reason of a contract with that company wherein it waived all claim for damages by reason of any requisition proceedings and consented to deliver its power to private individuals as directed in the agreement, and that if the plaintiff has any right of action it is against the Niagara Falls Power Company by reason of this contract;
(5) That under this contract, if the Government exercised any right, it was merely the right to direct how the power of the Niagara Falls Power Company should be used, and to what individual manufacturers it should be distributed in connection with and to promote the prosecution of the war and the national defense; and
(6) That if there was a taking it was under a claim of right.
The plaintiff owned; a plant for the manufacture of paper, located above and near the falls of the Niagara River, which was operated by water power. This power was secured through an intake opening on a canal con *434 structed above the Falls and owned and operated at the time by another corporation, the Niagara Falls Power Company. The plaintiff’s property did not abut on this canal and was separated from it by a street. The water was passed through an intake from the canal to and down a chute extending some distance below its level to machinery which was propelled by the force of its fall, and the water carried out through a small runway into the main runway of the Niagara Falls Power Company, and from there to the river below the Falls. It had secured the right to use the water from the canal by a contract with the Niagara Falls Power Company, which allowed it to take sufficient water to generate a certain number of units of power.
The Niagara Falls Power Company, prior to the execu- • tion of said contract, had constructed a canal in the nature of a cul de scte on its own land, and connected with the waters of the Niagara River above the Falls, and in such a way that the water ran into this canal up to the level of the river. Near the end of the canal it had constructed a •chute which carried the water some distance below the surface, and as in the case of the International Paper Company it turned machinery which generated power. It had also its own underground runway above mentioned, which carried this water off and into the river below the Falls. Its business was producing power and selling it for manufacturing, lighting, and other purposes. It did not manufacture anything but power. Its product was power.
The Niagara Falls Power Company was using the water which passed into its canal under a license from the United States granted by the Secretary of War by virtue of the authority given him under the act of June 29, 1906, 84 Stat. 626, known as the Burton Act. This license limited said company to the use of water sufficient to produce a certain number of unit's of power. The license was revocable at the will of the Government and discretion of the Secretary of War.
The Niagara River was in the nature of an international boundary between the United States and Canada, and under a treaty of May, 1910, between the United States and Great *435 Britain, was open to the joint and unrestricted use for navigation and all necessary control of navigation as might be determined by joint action. And under treaty, also, between these countries a limit was placed on the amounts of water that could be taken by each of them from the Niagara Biver for the production of power; that is, each was allowed to use water up to certain units of power. So that this treaty, as was intended,.placed the control of the water of the river for power purposes under the control of the two governments, and, being a treaty, it is part of the supreme law •of the land. We have, then, the Government of the United States, by treaty, obligated to limit on its side the amount of water to be taken from the Niagara Biver for power purposes and assuming control. But, aside from the treaty, as between the States and its citizens the Government had the right to control the use of power and the building of dams and structures necessary to generate power in the navigable waters of the United States, of which the Niagara Biver was a part. Congress on June 10, 1920, 41 Stat. 1063, passed the Federal Power Commission act, sometimes designated as the water power act, which imposed penalties for its violation and appointed a commission to control and pass upon permits. The right embodied in and exercised by this statute was based upon the authority of Congress to preserve the navigability of waters of the United States, including those open to foreign commerce. The constitutional power of Congress to exercise this right was fully discussed and considered by Congress during and prior to the passage of the act. In view of this conclusion of Congress as to its constitutional right to control water for power, this court will not undertake to say that it has not the power therein •asserted and exercised.
We further see that the Niagara Falls Power Company was securing water for its canal under a revocable license under the Burton Act, supra. Had the license been revoked, as it could have been at any time, its ability to produce its power would have ended, and the right to use the water in the canal would have terminated, as would the plaintiff’s right as its lessee. The plaintiff had no right to use or ■ connect with the water in said cañal of the Niagara Fails *436 Power Company except by contract with that company, and the right which was granted under the contract would give the plaintiff no higher rights than were possessed by the power company. And had the United States revoked the permit of the power company, which would have in effect canceled the contract of the plaintiff with that company, it is plain that the plaintiff could have had no action either against that company or the Government which canceled the license.
The Council of National Defense, under authority of the act of August 29, 1916, chap. 418, 39 Stat. 649, was granted authority to make recommendations to the President and heads of departments, among other things, as to the “ utilization of waterways, the increase of domestic production of articles and materials essential to the support of the Armies and of the people during the interruption of foreign commerce.” Prior to the issue of the so-called commandeering order by the Secretary of War, hereinafter mentioned, the Council of National Defense had held that the production of print paper was not an essential industry to the support of the Army and the conduct of war, and at the time of the issuance of the order much of the power produced by the Niagara Falls Power Company was being used for this purpose, and for the same purpose power secured from Canada was being used, and the Canadian Government had suggested that this latter power was not being used to operate industries which aided in the prosecution of the war.
Thereupon the Secretary of War, by authority of the President, on December 28, 1917, issued an order to the Niagara Falls Power Company, which stated that the President “ hereby requisitions the total quantity and output of ■the electrical power which is capable of being produced or delivered by you through the use of all waters diverted or capable of being diverted through your intake canal or your plants and machinery connected therewith. You are directed to make immediate and continuous use of such power until further notice.” With this order was filed what was called a temporary “ waiver ” or contract by the Niagara Falls Power Company which was the result of prior negotiations. It recited the requisition just mentioned, and, fur *437 ther, “ that the Niagara Falls Power Company had requested to be permitted to carry on its business of production, importation, sale, and distribution of such power ” as it could develop consistent with the exigencies of national security and defense, and that the Secretary of War felt that such exigencies would be provided for if the power company would distribute all the power which it was capable of producing in the manner indicated in an attached schedule, which schedule gave the names of certain plants to which power was to be distributed and furnished. The plaintiff’s name was ■ not among those named and by virtue of this agreement between the Secretary of War and the power company it would be cut off and was cut off from taking water for its power plant under its contract with the power company, as the latter was to use all the water that the Government under the license allowed to be taken.
This waiver or, rather, contract, for contract it was, further recited that the Niagara Falls Power Company had offered to waive all claims for compensation from the United States by reason of said order and requisition, and it agreed to deliver the power under the conditions set forth in said schedule. The contract provided that in view of the facts recited the United States Government waived delivery, until further notice, to the United States of any power upon condition that it be distributed to the parties named in the schedule, and the power company waived any and all right to compensation from the United States by reason of said requisition order, or the delivery of power under the conditions named in this contract.
It will be seen that the Niagara Falls Power Company, without the permit from the Government, or in case of the cancellation of the permit, would be operating illegally and the rights of the plaintiff against the United States could not be better or other than those of the Niagara Falls Power Company. Instead of cancelling the permit of the power company by not including the plaintiff in the schedule, the permit which the plaintiff had secured by its contract with that company was frustrated. If the Government had the right to cancel as to the Niagara Falls Power Company, it had the right to cancel as to plaintiff. Whatever the action *438 which it took may be called, it proceeded under a claim of right. Tempel v. United States, 248 U. S. 121; Ball Engineering Co. v. White & Co., 250 U. S. 46, 57; and Natron Soda Company case, 251 U. S. 138. It follows also in this connection that if the Government assumed control of, or was obligated to control, the use of water from the Niagara River for power purposes under the aforesaid treaty with Great Britain, it had this right of control under the Constitution and was exercising it by virtue of the aforesaid Federal Power Commission Act (June 10, 1920).
But, aside from this view of the matter, if the foregoing considerations were not in the case, the plaintiff could not recover, (1) because it was deprived of its contract with the Niagara Falls Power Co. by a contract which the latter company voluntarily entered into with the United States, and if it had any right of action it would be against that company; (2) what the Government took by the requisition order, if it took anything, was the product of the Niagara Falls Power Company. It did not take its plant or the use of it. It did not take its canal. It took what power it could produce and was producing from the entire plant; that is, as stated, it took the product of the plant, not the plant.
By reason of the alleged taking, the contract to furnish so much water to the plaintiff was frustrated, not taken. The situation, as far as the principle involved is concerned, is the same as in the Omnia Commercial Co. case, 261 U. S. 502, 511. The damage to the plaintiff was incidental. .The Government did not take plaintiff’s plant or its contract with the Niagara Falls Power Company, nor did it intend to take it.
In this case the Government, if it took anything, did not take the res, as it was held in the Duckett case, 266 U. S. 149, that it did. There it took over the whole terminal plant, and the plaintiff was the lessee of a portion of it, and it was held that the taking over of the res took his lease, which was a part of the res, but in the case at bar the Government did not take the res, it did not take over the plant or its operation or its use. It simply commandeered the output or product of the plant, that is, such power as the plant under the conduct and management of the company was able to turn out, and this is as close to what was done in the Omnia Com *439 mercial case, supra, as we could well have it without having the identical facts. In that case plaintiff had a contract antedating the taking, under which the company was to. furnish it so many tons of steel at a given price for which it had already'paid. The court held that the contract was not taken, but frustrated, and that it was an incidental loss for which there was no recovery, a loss incident to the legitimate exercise of a sovereign right by the Government.
But, further, by the subsequent contract with the Niagara Falls Power Company by which the plaintiff was deprived of its rights, the Government did not even appropriate or receive the product, as in eminent domain, of the Niagara Falls Power Company for public use, but, on the contrary, it was furnished to and received by those corporations named in said schedule, with the consent of said company. It controlled the distribution of the product under a contract with that company, in which contract that company expressly waived all claims for damage, if any there were, by reason of the previous requisition to which this contract was the successor. The Government did not take the property of the Niagara Falls Power Company without its consent, but, on the contrary, with its consent, and if there was no taking as to the Niagara Falls Power Company, it is very plain that there would be none as far as the plaintiff is concerned.
In 1902 an international waterways commission, composed of three representatives of the United States and three representatives of the Dominion of Canada, was created, 32 Stat. 373, which recommended that the amount of water to-be taken on the American side from the Niagara Fiver above the Falls should be limited to 18,500 cubic feet per second. Thereafter Congress asserted its constitutional right to control water of navigable streams within the control of the United States. On June 29, 1906, it passed what was known as the Burton Act, 34 Stat. 626, which authorized the Secretary of War to grant permits for the diversion of 15,600 cubic feet per second from the Niagara Fiver. The Niagara Falls Power Company applied for and was-granted revocable licenses beginning August 16, 1907, and from time to time they were renewed by joint resolutions *440 of Congress. Under date of January 19, 1911, a license revocable at tbe will of the Secretary of War was granted, and on July 1,1918, a further revocable license was granted authorizing the diversion by the Niagara Falls Power Co. and the Hydraulic Power Co., a subsidiary of said company, of practically 97%% of the amount of power allotted to the United States under the said treaty, and thereafter, on July 30, 1919, another revocable permit or license was granted the said Niagara Falls Power Co. for not exceeding 19,500 cubic feet, being the aggregate of what had hitherto been allowed to that company and the said Hydraulic Power Co.
In 1920 Congress passed the water power act, supra, asserting control of the use of water in navigable waters for water power.
If the United States Government in entering into the treaty of May, 1910, with the British Government, by which it undertook to control and limit the use of the Niagara Fiver for water power, was within the limits of its constitutional power, and if aside from this treaty, which is the supreme law of the land, Congress had constitutional power and had exercised it by the Burton Act and Federal Power Commission Act, supra, to control and limit the use of said waters for said power purposes, then the contention of the plaintiff that it had a vested right under sundry conveyances and the law and decisions of the courts of New York to take and use water from the Niagara Eiver can not be sustained; and it would be extending this opinion beyond necessary limits to discuss these rights. Suffice it to say that whatever these rights may be under the law and decisions of New York, and the conveyances of title to plaintiff, we do not think that they can be asserted or are or can be of avail against the conclusion which we have reached as to the controlling effect, as far as this case is ■concerned, of the said treaty with Great Britain and action of Congress in exercising its power to control said waters.
To sum up our conclusions: The Government did not, and did not intend to, take' the plaintiff’s property. If it be held that it took the property of the Niagara Falls Power Company, the loss of the plaintiff was incidental to the *441 exercise of a sovereign right. By the contract with the Niagara Falls Power Company the Government secured the distribution of the power of that company to individuals in aid of the prosecution of the war. If it be held that it did take the property of the Niagara Falls Power Company, it took it under a claim of right by virtue of the authority of' the Constitution and the said acts of Congress giving it control of water power. It did not take control of the product and output of the Niagara Falls Power Company without its consent, but, on the contrary, with and by its-consent, by contract, and not for the public use of the United States in its corporate capacity but for the use of certain citizens thereof in the aid of national security and defense.
Inasmuch as we hold that there was no taking, it is not. necessary to pass upon the question whether the Lever Act applies or not and whether this court has jurisdiction.
The petition should be dismissed, and it is so ordered.
GreeN, Judge, and Booth, Chief Justice, concur.