649 P.2d 293

CITY OF PHOENIX, a Municipal
Corporation, Plaintiff-Appellee,

and

David M. Paton and Rose Eleanore
Paton, his wife,
Cross-Defendants-Appellees,

v.

SOUTH BANK CORPORATION, an
Arizona Corporation,
Defendant-Cross-Claimant-Appellant.

No. 1 CA–CIV 5093.

Court of Appeals of Arizona,
Division 1, Department B.

April 13, 1982.
Rehearing Denied June 17, 1982.

Frank E. Dickey, Jr., Leon S. Jacobs,
Molloy, Jones, Donahue, Trachta, Childers
& Mallamo, P. C. by Herbert A. Mallamo,

and Hughes & Hughes, P. C. by Coit I. Hughes, Phoenix, for defendant-cross-claimant-appellant.

Andy Baumert III, City Atty. by Kent T. Reinhold, Asst. City Atty., Phoenix, for plaintiff-appellee.

Burch & Cracchiolo, P. A. by Frank H. Burch, Phoenix, for cross-defendants-appellees.

## OPINION

### B. MICHAEL DANN, Judge.

The City of Phoenix commenced this litigation to condemn 10.92 acres of land owned by the appellees Paton for a land-fill site. Just prior to the inception of the litigation the Patons had entered into a "material sales contract" with the appellant South Bank Corporation, by which South Bank obtained the right to purchase sand and gravel "in place" on the Patons' land. The basic issue on appeal is whether South Bank had an interest in the land for which the city was required to pay compensation in the condemnation proceeding. We have concluded that the summary judgment of the trial court against South Bank must be reversed.

The land in question comprises a portion of the south bank of the Salt River as it runs through the City of Phoenix. The Patons purchased the land in 1963 for long term investment. On May 21, 1974, when the city commenced the instant condemnation proceedings, the city operated a land-fill on property adjacent to the subject property. On March 19, 1974, just two months prior to the institution of the condemnation proceedings, the Patons and an agent for an undisclosed principal (South Bank) executed the "material sales contract" referred to above. Eliminating portions without critical materiality to the issues of the present case, the contract reads as follows:

### MATERIAL SALES CONTRACT

Comes now the following named parties and for good and valid consideration hereby enter into this Exclusive Sale and Purchase Agreement for Sand and Gravel.

\* \* \* \* \* \*

2. That the First Party [Patons] is desirous of making the ultimate utilization of the real property to obtain the maximum income and return from this most valuable and unique parcel of real property containing a massive sand and gravel deposit.

\* \* \* \* \* \*

4. That First Party is desirous of entering into an exclusive agreement for the sale of the sand and gravel in place located on said property and they are not interested in engaging in the mining and manufacturing mineral aggregate at this juncture of time, further it will rent industrial space to contractors, manufacturers, etc., on the real property that is not being mined for san [sic] and gravel or being used in the manufacture of mineral aggregate and heavy contracting operations, it will also construct a temporary portable office complex that will be rented to the tenants who are renting temporary yard space from us for their operations.

\* \* \* \* \* \*

8. It is expressly understood that the First Party is only selling the sand and gravel in place. They are not renting and/or leasing said real property. That the Second Party [agent for undisclosed principal] is not paying a royalty to the First Party.

9. That the Second Party has no interest in the real property, save and except that they have the exclusive right to purchase the sand and gravel from said pit and they own out right all materials that they have prepaid. The party of the First Part is the owner of any and all material until the Second Party pays for the same.

10. The Second Party will buy all the material contained in said property regardless of quality.

## TERMS

1. The purchase price is 25¢ per ton for the sand and gravel in place on said property.

2. That the Second Party will purchase a minimum of $1,000.00 worth of material in advance monthly for the term of this Agreement.

3. That after a period of 6 months (which will be necessary to set up the necessary plant facilities) the Second Party will purchase a minimum of $1,200.00 worth of material per month. Said purchase shall be made in advance and payable on or before the 10th of each month.

That in the event the Second Party purchases more than $1,200.00 per month, it will pay for the same on or before the 10th of the preceding month.

4. The Second Party shall avail itself to all the land to conduct its mining and plant operation, without any payment for the use of the same.

5. The Second Party will conduct its mining operations of the sand and gravel pit to utilize the material to a depth of 200 feet as feasible.

6. That the First Party expressly reserves the right to possession and use and the profits from said property that is not being mined and used by the Second Party in its operations on said property.

7. That in the event the Second Party fails for a period of 6 months to make its monthly payments in advance, then and in that event the Agreement of Sale of Materials shall be canceled and voided and of not other force and effect.

\* \* \* \* \* \*

9. That in the event the Second Party is prevented from removing of any material that it has purchased from First Party through no fault of the First Party, that said mandatory monthly payments will be deferred until the First Party can deliver said material free and clear title to said personal property, to Second Party.

That Second Party will endeavor to make up any lost monthly payments as soon as sound business practice permits.

\* \* \* \* \* \*

11. That the Second Party shall have no interest in the oil rights located on said property.

12. That the First Party will defend its rights to sell said material, in the event any Third Party should interfere with their property rights.

\* \* \* \* \* \*

15. If any other party, other than First Party, should take possession of said property preventing Second Party from removing material from said pit, for which it has paid, then and in that event the First Party is not obligated to reimburse said Second Party for any improvement. Second Parties relief is to recover from the party preventing them from removing their property.

Additional facts will be referred to in connection with discussion of the specific contentions of the parties as necessary.

## I. STATUS OF THE CITY AS A REAL PARTY IN INTEREST

■ The city has filed the only brief for appellees in this appeal. The Patons, however, requested and were granted leave to join in the city's brief.

Appellant has challenged the right of the city to participate in this controversy which concerns the question of whether South Bank does or does not have an interest in the property. The city argues that it has sufficient standing in the matter because of its interest in seeing to an expeditious termination of the condemnation proceedings. It concedes that the over-all value of the property would not be affected by resolution of appellant's claim.

While it might be said that the city is at most a stakeholder with no interest in the controversy between appellant and the Patons, who assert competing interests in the realty (See 2 *Nichols on Eminent Domain* § 5.3[4] (3rd Ed. 1980)), it is not necessary

for us to resolve this issue since the city's brief has been adopted by the Patons who clearly are interested parties *vis a vis* appellant. Thus, the matters contained in the city's brief are properly before us.

## II. DID APPELLANTS HAVE A COMPENSABLE INTEREST IN REAL PROPERTY

Appellees' principal legal contention is that the contract did not vest appellant with a legally cognizable interest in the property for which compensation was payable upon taking. We find that the more persuasive authorities are to the contrary.

█ Appellant contends that its interest is properly classified as a *profit a prendre.* Appellees, on the other hand, describe appellant's interest in various ways, ranging from a simple "license" to an "executory sale of personalty, coupled with an incidental license to dig and remove sand."

The agreement is couched in terms of a "sale of sand and gravel in place." It in essence grants to appellant the right to come upon the land after having paid for a certain quantity of material and remove the same. It also grants to appellant the right to have mining and milling equipment on the property in furtherance of its rights under the contract. A closely analogous agreement was held to be a *profit a prendre* in the case of *Bates Sand & Gravel Co., Inc. v. Commonwealth*, 380 Mass. 933, 404 N.E.2d 81 (1980).[1] Viewed in terms of what the agreement was designed to accomplish, the removal of portions of the real estate, it defines a classic *profit a prendre* arrangement. See 1 *Thompson on Real Property* § 135 (1980 replacement); *Picchi v. Montgomery*, 261 Cal.App.2d 246, 67 Cal.Rptr. 880 (1968); *Sehle v. Producing Properties, Inc.*, 230 Cal.App.2d 430, 41 Cal.Rptr. 136 (1964); "An Analysis of Profits a Prendre," XXV *Oregon Law Review* 217 (1946); *Restatement of Property* § 450, Comment f (1944). According its terms a reasonable construction, we think that the contract can only be legally described as creating a *profit a prendre* interest in appellant.

The leading treatise on condemnation states that *profits a prendre* are interests in real property. 2 *Nichols on Eminent Domain* § 5.72(7). *Bates Sand and Gravel Co. v. Commonwealth, supra,* adopts and applies this rule. *See also United States v. 145.30 Acres of Land More or Less*, 385 F.Supp. 699 (W.D.La.1974), aff'd., 524 F.2d 1231 (5th Cir. 1975). *United States v. 1070 Acres of Land*, 52 F.Supp. 378 (M.D.Ga.1943), indicates, in *dicta*, a contrary view. This case is discussed below.

█ It is true that a mere licensee has no legally cognizable interest in property upon condemnation. This is because a license is generally revocable at the will of the landowner. 2 *Nichols On Eminent Domain* § 5.751; *Tidwell v. State ex rel. Herman*, 21 Ariz.App. 3, 514 P.2d 1260 (1973). Likewise, a mere "occupant" of land without some form of permanent status has no compensable interest in the property. 2 *Nichols On Eminent Domain* § 5.23[7].

We would have a more difficult case than *Bates* but for the fact that by the provisions of the agreement here appellant was required to purchase first $1,000 and later $1,200 worth of material per month and it was also required to purchase all sand and gravel down to 200 feet below the surface. While a purely optional arrangement with respect to purchases of material might be more analogous to a license, an obligation to steadily purchase such substantial portions of the realty cannot be so regarded. We also agree with appellant that after a proper tender, it would have a *prima facie* right to a decree of specific performance to carry out its mining operations.

Appellee has emphasized the language of paragraphs eight and nine in the main body of the agreement and also the language of subparagraph four under the "terms" set forth in Paragraph 10 of the agreement. Particular stress is laid upon the first clause

---

1. This decision of the Supreme Judicial Court of Massachusetts in effect affirmed an earlier decision of the Massachusetts Court of Appeals reported at 8 Mass.App. 331, 393 N.E.2d 956 (1979).

of paragraph nine of the body of the contract. The statement therein that "the Second Party has no interest in the real property" is, however, qualified by the "saving and excepting" clause which immediately follows and which describes the kind of arrangement found cognizable as a compensable property interest in *Bates Sand and Gravel v. Commonwealth, supra.* Reading the contract as a whole, we find nothing destructive of appellant's interest in the property in either of these clauses.

Appellees particularly rely upon two authorities, *U. S. v. 1070 Acres of Land, supra,* and *Saxman v. Christmann,* 52 Ariz. 149, 79 P.2d 520 (1938).

The basic holding in *1070 Acres* was that the asserted interest in land was not sufficiently described. 52 F.Supp. at 379. The court went on to state however, in *dicta,* that the sand and gravel contract in question was one merely for an executory sale of personalty, coupled with an incidental license to dig and remove the sand. The focal point of the opinion for present purposes is its conclusion that when the United States exercises legal rights which render impossible the performance of a contract with another, the contract is at an end. *Omnia Commercial Co. v. United States,* 261 U.S. 502, 43 S.Ct. 437, 67 L.Ed. 773 (1923), and other war-requisition cases are cited in support of the conclusion. We reject the controlling application of the war requisition cases in the condemnation situation; the controlling question in a condemnation proceeding is whether the contract established an interest in the land. The *dicta* in *1070 Acres* was rejected by the Massachusetts court in the *Bates* case. We similarly reject it here.

*Saxman v. Christmann* involved a "special use permit" issued by the U. S. Forest Service. The question of whether the permit was a lease or a license came up in a quiet title action brought by the permittee. The permit contained various provisions for revocation. Our Supreme Court held that it was "a mere license, at most. It certainly is not a lease." 52 Ariz. at 153, 79 P.2d at 521.

There are obvious and marked differences between the instrument in *Saxman* and the contract in this case. These render extensive discussion unnecessary. Appellees rely most heavily upon the following language quoted from 17 Ruling Case Law 570 § 83:

... In general, a contract simply giving a right to take ore from a mine, no interest or estate being granted, confers a mere license, and the licensee acquires no right to the ore until he separates it from the freehold....

52 Ariz. at 153, 79 P.2d at 522.

Again, we are more impressed with the holding in the recent *Bates* case from Massachusetts and the rule set forth in *Nichols* cited above than we are with this generality stated in *Saxman.*

*Saxman* is not concerned with a *profit a prendre.* It is solely concerned with the lease-license dichotomy. The place of the *profit a prendre* within this framework is the subject of discussion in 3, *American Law of Mining* (1960), § 14.3. The passage is sufficiently enlightening that we set it forth at length:

§ 14.3 PROPERLY EXECUTED AGREEMENTS TO EXPLORE AND MINE.

The properly executed mining license, granting the right to go upon the land of another to explore for minerals and sever and remove them when found, *i.e.,* to mine, need not be a license. It may be a nonpossessory or incorporeal interest in land called a *profit a prendre.* As such, the contract right is irrevocable and may be assignable. The mining license thus classified may constitute a freehold or a term for years, with the duration being determined by the words of the grant. Since the mining license transfers an interest in land, to be executed properly it must comply with the requirements of the statute of frauds and other local statutes dealing with transfers of real property.

While the distinction between mining leases and mining licenses has been said to be that the former is exclusive in na-

ture, a mining license in the nature of a *profit a prendre* may also be exclusive. It need not be, but when granted in gross for commercial purposes, it is usually so intended. The exclusiveness which does distinguish the mining lease from the mining license lies in the classification of the lease as a possessory interest in land which carries with it the right to exclusive possession. The exclusiveness of the mining license in the nature of a *profit a prendre* is limited to the mining process itself. The difference is more apparent than real, for the only advantage to the lessee, as distinguished from the licensee, is the availability of possessory actions, such as ejectment. While ejectment is not within the scope of the mining licensee's power, he may protect himself against any interference with his right to mine, and this, of course, is all that is necessary.

Despite the apparent aptness of the *profit a prendre* as a classification for the interest created by a mining license, it is often ignored. Perhaps influenced by the designation "mining license," and perhaps by a desire to prevent long term restraints of mining rights, the courts have tended to deal with agreements to explore and mine on an "either-or" basis—either as a mining lease or as a bare license. Thus, in *Von Goerlitz v. Turner*, [65 Cal.App.2d 425, 150 P.2d 278 (1944)], the court undertook to determine whether a written agreement to mine on a royalty basis was a mining lease or a mining license. Upon concluding that the agreement did not give "exclusive possession of the premises against all the world," the court properly decided that the agreement before it was not a lease. Then, following the "either-or" technique, the alternative finding was made and the interest designated a bare license. The sharp dichotomy, with the choice limited to either a lease or a bare license, is too narrow. A finding of an irrevocable mining license is not precluded by a determination that the licensee was not granted "exclusive possession of the premises against all the world." Such determina-

tion merely rules out the lease. As a *profit a prendre*, the mining licensee's interest is nonpossessory and need not be exclusive. *Assuming an instrument which is properly executed, the next step after discarding the lease as a possibility should be to determine whether the parties intended the property interest created by their contract to be revocable or irrevocable. It is only if it was intended to be revocable that the bare license is the proper finding. If intended to be irrevocable, something other than a bare license is involved, whether it be called a profit a prendre or some other name.* (Footnotes omitted; emphasis supplied.)

This raises the question of whether there is an intention that the right granted be revocable. This is discussed in section five.

### III. TERMINATION AT CONDEMNATION

Appellees next argue that appellant's contract rights were terminated and destroyed when the city condemned the property. We take this argument to be a variation upon the theme that appellant's interest was in the nature of a personal permit, or license. The contention has been essentially disposed of above.

### IV. REVOCATION

■ There is no express provision in the contract for revocation. Nor are we able to perceive any indicia from which an intent to make revocable can be implied. The contract appears to contemplate a substantial, long-term relationship. The fact that the contract was without a defined term did not have the effect of destroying it as a valid property interest in the nature of a *profit a prendre*. See 1 *Thompson on Real Property* § 135 at 475. In the absence of a breach resulting in a termination of the contract, appellant's rights were coterminous with appellees' interest in the land.

### V. TERMINATION BY BREACH

■ Appellees' last argument is that the contract between them and appellant was

terminated by appellant's breach in failing to make payments for six consecutive months after an initial $1,000 was paid by appellant in April, 1974, and before the city gained legal possession of the land on January 20, 1975. Appellees rely on subparagraph seven under the "terms" set forth in the contract. Appellant claimed frustration and, in effect, impossibility of performance by reason of the city's actions in destroying access to and from the property. We find that an issue of fact exists in this regard, making summary judgment improper.

■ It must be borne in mind that summary judgment is inappropriate if there is the "slightest doubt" in regard to the material facts. *Peterson v. Valley National Bank*, 90 Ariz. 361, 368 P.2d 317 (1962).

Appellees claim that appellant never put the issue of frustrated performance before the court prior to rendition by minute entry of summary judgment on January 13, 1977. Formal written judgment was not entered until July 27, 1979.

Our review of the record shows that appellant did put the issue before the court in a timely manner. Appellant argued "frustration" of the contract in its motion for partial summary judgment and in an affidavit attached to this instrument filed June 11, 1976, Francis J. Brown stated, "South Bank was prevented (frustrated) from performing under the contract because of the intervening acts of the City of Phoenix." On November 3, 1976, appellant filed, among a great many other materials, another affidavit of Brown in support of its motion for partial summary judgment describing generally the acts of the City of Phoenix which prevented access to the property. While it is not clear that Brown was speaking from firsthand knowledge, and while this affidavit is not specific as to the dates of the various acts described, it implicitly refers to the period prior to the order granting the city possession and, considering the inferences which must be indulged in favor of a party opposing a motion for summary judgment, *Livingston v. Citizens Utility, Inc.*, 107 Ariz. 62, 481 P.2d 855 (1971), we cannot say that the acts did not interfere with access during the relevant six month period. Appellees cite the deposition testimony of W. Francis Brown, but we do not find in it a negation of the interference and frustration asserted in the affidavits.

According to the present record, appellant removed only a total of some $1,423.75 worth of sand and gravel from the land on August 8 and 9, 1974. While appellant did not pay to appellees the indicated $423.75 debt, this was incurred less than six months before the city took possession of the property.

If, as appellant asserted, it could not remove sand and gravel, the purpose of the contract was obviously frustrated. *Corbin on Contracts* § 1356 (One volume ed. 1952). The ninth "term" under the tenth paragraph of the agreement appears to recognize a situation of this nature. In our opinion frustration was a defense to termination by breach and an issue of fact was presented in this regard.

## VI. CONCLUSION

The judgment is reversed and the cause remanded for further proceedings consistent herewith. Subject to the triable issues relating to breach by South Bank and frustration by appellant, South Bank should be permitted an opportunity "to prove the fair market value of its interest in the land . . ., i.e., the value of the sand [and gravel] as it lay undisturbed." *Bates Sand & Gravel Co., Inc. v. Commonwealth*, 8 Mass.App. 331, 393 N.E.2d at 958.

HAIRE, Acting P. J., and RICHARD M. DAVIS, J. Pro Tem., concur.

NOTE: The Chief Justice of the Arizona Supreme Court has authorized Judge B. Michael Dann, Maricopa County Superior Court Judge and Judge Richard M. Davis, a Judge *pro tempore* of a court of record to participate in this matter pursuant to Arizona Const. art. VI, §§ 3, 20.