Green, Judge,
delivered the opinion:
The plaintiff bases its suit upon allegations which may in general terms be stated to be that the defendant has taken property belonging to the plaintiff by reason of which plaintiff seeks to recover just compensation. The property alleged to have been taken is an interest in two vessels acquired through charter parties executed to the plaintiff in the manner hereinafter set forth.
The parties to the action have made a stipulation as to the facts which is about 170 closely typewritten pages in length and which would fill about the same number of printed pages of the size ordinarily used in briefs. This statement has been somewhat condensed in the findings of fact, in which we have included everything we consider might be material. As stated in the stipulation and the findings, the facts seem extremely involved and complicated, but under the view which we take as to the law much of this matter is not material to a decision of the case.
*113 The period of time involved in the case begins with October, 1917, when B. L. Stafford and R. E. Miller, as copartners, bought the steamships James S. Whitney and H. M. Whitney, which were already subject to certain mortgages, borrowing considerable sums of money for the purpose and executing contracts, or giving mortgages to secure the loans so obtained. It ends in July, 1919, when the Shipping Board, which had during the World War requisitioned these two vessels for war purposes, released them to the Acme Operating Corporation, plaintiff herein. In the meantime and in December, 1917, Stafford and Miller, together with other parties not financially interested but joined for the purpose of complying with the corporation laws of the State of New York, organized the Acme Steamship Corporation, the Whitney Steamship Corporation, and the Acme Operating Corporation, and subsequently became owners of fifty per cent each of the stock of the three corporations, up to April 23, 1919, when Miller assigned all his stock in the Acme Operating Corporation to Stafford, or his nominee.
Almost immediately after the organization of these corporations through contracts executed between Miller and Stafford and the steamship corporations, “the equitable title” to the S. S. James S. Whitney was conveyed to the Acme Steamship Corporation and “the equitable title” to the H. M. Whitney to the Whitney Steamship Corporation. Thereafter the two corporations severally executed charter parties upon the vessels by which the control of the steamships was transferred back to the copartnership, and finally, on January 7, 1918, these charter parties were assigned to the plaintiff herein. The basis of plaintiff’s suit, as we shall see later, is the interest in the two steamships derived through these charter parties, which interest is alleged to have been damaged or injured by the action of defendant in requisitioning the vessels in the manner hereinafter explained.
In order to understand fully upon what the plaintiff’s claim is based, it is necessary to state the transactions in relation to the ships more in detail. The charter parties made by the two steamship companies to the copartnership of Miller & Stafford provided, among other things, “that the * * * owners agree to let and the * * * charterers agree to hire the said steamship from the time of delivery *114 for about three months,” and “that the charterers shall pay for the use and hire of the said vessel (46/6) forty-six shillings six pence British sterling per calendar month commencing on and from the day of her delivery,” and also—
“That the owners shall have a lien upon all cargoes, and all subfreights for any amounts due under this charter, and the charterers to have a lien on the ship for all moneys paid in advance and not earned, and any overpaid hire or excess deposit to be returned at once.”
These charters were dated January 7, 1918, and were made by the respective steamship companies as agents for the owners thereof.
Immediately upon the execution of these charter parties, Miller & Stafford executed an assignment thereof to the Acme Operating Corporation, and it is upon this transfer and the provision above quoted with reference to the lien which the owners shall have that the plaintiff bases its case. Books were opened by the Acme Operating Corporation covering all transactions with respect to the two steamships by the copartnership of Miller & Stafford and the three corporations mentioned. All receipts and disbursements in relation to said vessels were consolidated and carried in a single set of books.
In the meantime the S. S. James 8. Whitney was placed in the yards of Valk & Murdock to be enlarged, which was done at a cost of over $132,000, and the S. S. H. M. Whitney was enlarged by Crane’s Sons Company at a cost of over $253,000, on account of which libels in rem were filed by these construction companies, and through court proceedings the two steamships were taken and held by United States marshals. While these vessels were respectively in the custody of United States marshals and about April 29, 1918, the Shipping Board, which was a department of the Government of the United States, took possession of the two vessels under a requisition order and did not finally release them until July, 1919.
After the Shipping Board had requisitioned the vessels and on December 4, 1918, there were executed nunc pro tunc, the one as of April 27, 1918, and the other as of April 28, 1918, charter parties (bareboat form) on standard U. S. S. B. Charter Form No. 2, respectively, between the board and *115 Acme Steamship Corporation, covering the S. S. James S. Whitney, and between tbe board and Whitney Steamship Corporation, covering the S. S. H. M. Whitney. With reference to these charters and all through the opinion the distinction must be observed between the Acme Steamship Corporation and the Acme Operating Corporation, plaintiff herein. In these charters there were a number of agreements made by the respective parties some of which involved the expenditure of large sums of money by the Shipping Board and all pertaining directly or indirectly to what should be done with the said vessels and cargoes for which Miller & Stafford had previously issued contracts of affreightment. The most important provision in this contract reads as follows:
“In consideration of the compensation provided and the other obligations assumed by the United States hereunder, the owner accepts this Requisition Charter in full satisfaction of any and all claims he has or may have against the United States arising out of the Requisition and accepts the compensation herein provided for as the just compensation required by law, * * (Italics ours.)
Although the plaintiff was not named as a party to this contract, the defendant insists that plaintiff is bound thereby. The grounds for this contention will appear later on.
After the ships had been turned back, a controversy arose over a proper settlement by the board with the various parties having interests in these vessels. After long negotiations the comptroller of the Meet Corporation made a final statement of the account of the Acme and Whitney Steamship Corporations with the board, from which it appeared that these corporations were indebted to the board under the contract on items amounting to $876,210.33, and that they were entitled to credit on items amounting to $799,141.79, leaving a balance in favor of the board as agent for the Government of $77,068.54, which we have found to be correct. It is obvious that if the provision of the charter party contract last above quoted is binding upon plaintiff (as we think it is for reasons hereinafter set forth), plaintiff can not recover herein. The defendant also contends that even if plaintiff is not bound by this provision it can not recover for several reasons, one of which is that in any event *116 no property of the plaintiff was taken but at most plaintiff was merely frustrated in enforcing its liens, if it had any. These matters will next be taken up.
In order to properly consider plaintiff’s case, it is necessary to state the claims made in its behalf so far as we consider they merit discussion. It should also be noted in this connection that plaintiff’s suit is not based upon this contract or any of the numerous contracts executed by the parties in suit, but simply upon the claim that the Government had requisitioned certain of its property and that it was entitled to just compensation therefor. More specifically stated, the claim of the plaintiff is, as stated in argument by its counsel, that under the provisions of the charter parties assigned to it [1] plaintiff had paid in advance to the Acme Steamship Corporation the sum of $296,705.07 and to the Whitney Steamship Corporation the sum of $249,151.74, which amounts were not earned under the charter parties assigned to it (plaintiff) and that it had a valid and subsisting lien against the Acme Steamship Corporation and the Whitney Steamship Corporation upon the respective steamships equal to such amounts at the time they were requisitioned, and also that at the time the vessels were returned to their owners the value thereof was much less than when they were originally requisitioned. The contention of the plaintiff is that by reason of its alleged lien upon the vessels it was entitled to just compensation for their seizure and that this just compensation would include depreciation in the market value of the vessels. The burden of proof is upon the plaintiff in the first instance, but the issues will be better understood when we state the defenses presented by the argument on behalf of the defendant. They are as follows:
(1) That defendant requisitioned nothing and took nothing from plaintiff for the reason that plaintiff was not entitled to possession of the vessels at the time they were requisitioned, or during any of the time defendant used them.
(2) That plaintiff made no advancements upon the vessels but simply paid out of money received on affreightment *117 contracts, made before it received the assignment of the charter parties, certain amounts in connection with the operation of the vessels.
(3) That in no event could the plaintiff acquire a lien for any money advanced (if it did advance any) for the reason that it was bound by the contract which Miller and Stafford and the parties who conveyed the vessels made with the defendant as to what it should pay for the use of the vessels, the several corporations which Miller and Stafford organized, owned, and controlled being merely, as defendant alleges, different forms under which Miller and Stafford operated.
Some other defenses are set up by the defendant, but our conclusions with reference to those above stated are such that it will not be necessary to consider them.
The defense first stated will be first taken up, but these defenses are so intertwined that we shall not attempt to proceed with their discussion in a logical order.
Conceding for the sake of the argument that plaintiff had valid and subsisting liens upon and against the two vessels which were requisitioned, we think it can not be said that these liens were requisitioned or that the Government appropriated or used any interest which the plaintiff had in the two steamships. What the Government requisitioned and all that the Government requisitioned was the possession of the steamships, and the plaintiff did not have possession of them at the time they were taken over, but they were held by United States marshals as detailed above; nor would plaintiff have been entitled to possession if the Government had not taken them. Conceding for the sake of the argument that the plaintiff had an enforceable lien against the steamships by virtue of a provision in the charter parties, the Government did not take over this lien, and if it in some way frustrated the enforcement of it in exercising its war powers the defendant is not liable by reason of such action. Had the defendant prevented the plaintiff from foreclosing a lien, a different case would have arisen, but we are not called upon to determine what the rule would have then been, for no such situation is presented by the facts in the case. If plaintiff actually had a lien on the vessels, it could have proceeded to foreclose it, and if it was then entitled to possession *118 it may be, although we do not so decide, that the Government would be liable by reason of having taken from plaintiff this possession. But plaintiff at no time while the Government held possession of the vessels was entitled to possession by reason of its lien. It had merely the right to foreclose its lien, if it had one. Moreover, as we shall see later on, the contracts made with the Government, to which the plaintiff had assented, were such as to prevent the plaintiff’s recovery herein. This makes it necessary to consider more particularly the contracts which had been entered into with reference to the two steamships.
A large number of parties were interested in the two steamships through transfers and contracts pertaining thereto. These parties were the plaintiff (the Acme Operating Corporation), the other two corporations organized by Stafford and Miller, the two trust companies which had made loans to enable Stafford and Miller to purchase the steamships and held mortgages thereon, the construction companies for whom United States marshals were holding the vessels under libel proceedings, the defendant, and others not necessary to mention, as we do not think their contracts had any bearing on the subject matter of the case. The transfers and contracts made under the direction of Miller and Stafford were so numerous and involved so many provisions that the reasonable limits of this opinion prevent all of them being set out. At this point it may be sufficient to say that by what appears to us to have been a jugglery back and forth between Miller and Stafford and the two steamship corporations created and controlled by them, the copartnership of Miller and Stafford, having acquired control of the steamships, transferred the title thereof to these corporations, finally had the charter parties executed back to themselves, and then assigned these charters to a corporation which they created and controlled, which is the plaintiff herein. After all this had been done, the construction companies who had rebuilt the vessels libeled them and seized them through court proceedings, and they were held by United States marshals when the Government requisitioned them. Following the requisitions, Miller and Stafford, representing the corporations owned and controlled by them, as well as the representatives of the consignors and owners of cargoes for the *119 shipment of which upon the two steamships commitments, respectively, had been made, and the Trust Company entered into what is termed by the parties the contract of August 12, 1918, to which reference will hereinafter be made. This contract the plaintiff did not execute and claims it was not binding upon it, and it should be kept in mind that the construction liens upon the vessels in the end practically absorbed the whole of their value. It will be observed that the amount which the plaintiff paid out in connection with the vessels did not quite equal the amount which it received from affreightment contracts, and the result of sustaining plaintiff’s contention would be to enable the plaintiff to recover a very large amount from the Government for the requisition of the vessels at a time when plaintiff was not even entitled to the possession thereof, and make it certain that the Trust Company would realize nothing upon its mortgages. In other words, if the claim of plaintiff is sustained, the manipulation of interests in the vessels made by Miller and Stafford would result in the plaintiff getting all of the assets now pertaining to the vessels without becoming liable for any of the just obligations against the ships in the way of mortgages. That this would be grossly inequitable is quite apparent. We will next determine whether the law will support such a conclusion.
Assuming for the purposes of the argument only that plaintiff acquired a valid and subsisting lien upon the vessels through the assignment of the charter parties, we think the principles laid down by the Supreme Court in the cases of A. W. Duckett & Co. v. United States, 266 U. S. 149, 152, and Omnia Commercial Co. v. United States, 261 U. S. 502, prevent any recovery based thereon.
In A. W. Duckett & Co. v. United States, supra, the Supreme Court referrred to the decision in Omnia Commercial Co. v. United States, supra, which was a case wherein the Government had requisitioned the entire product of a steel company for a year and thereby made it impossible for the Omnia Company to enforce a contract for a large quantity of steel plate, which contract was made with the steel company prior to the requisition. The court held in the Omnia case that the contract was not taken but at most merely frustrated by the Government in the exercise of its war powers, and in com- *120 meriting on the situation in the Omnia case the Supreme Court said in the opinion in the Duckett case, supra:
“The contract was no part of the res taken and whatever might be the collateral consequences of the appropriation liability for them was not an incident of the Government's act.”
This language is peculiarly appropriate to the circumstances of the case at bar.
Further on in the opinion, in connection with the inter-venor’s claim, we shall call attention to some special features of the Duckett case, supra.
The defendant does not even concede that plaintiff had as against the United States a valid lien on the steamships, but it is insisted by counsel in argument that the Acme Operating Corporation was merely the Acme Steamship Corporation and the Whitney Steamship Corporation under a different name and guise, that all of these corporations were controlled absolutely by Stafford and Miller, who owned all the stock therein and manipulated them at will. We think this position well taken.
That the Acme Operating Corporation was simply another name under which Miller and Stafford and the other two corporations organized by them carried on the business of owning and operating the vessels is conclusively shown by the following matters which appear in the findings of fact:
(1) Miller and Stafford each owned fifty per cent of all of the capital stock of the three corporations. Miller was the president of each corporation, and Stafford the treasurer, down to the time when Miller assigned his stock to Stafford’s nominee, which was April 23, 1919, and thereafter Stafford was in sole control by reason of himself and his nominee holding all of the stock.
(2) While the steamship companies owned the vessels separately and the operating company merely had the right to control the vessels through a charter party contract, all three of the corporations were formed at the same time and with but one purpose — that of putting the ownership and operation of the two steamships nominally under corporate ownership and control, the corporations being actually controlled by Miller and Stafford.
*121 (3) The manner in which the Acme Operating Corporation kept its books with reference to accounts in the names of the two steamships and the Acme Steamship Corporation and the Whitney Steamship Corporation, respectively, the manner in which the correspondence was conducted on behalf of the Operating Corporation, and the manner in which contracts of affreightment were entered into by the several corporations which Miller and Stafford had created, all tends to show that they were in fact operated as one concern.
(4) The ships were chartered by the Acme and Whitney Steamship Corporations to the plaintiff for a mere nominal sum, namely, forty-six shillings six pence British sterling (46/6) each per month. This sum is so small that it tends to show that it was never intended that the charter parties should be put into effect.
In United States v. Reading Co., 253 U. S. 26, 62, while the court held that the mere fact of ownership by the same group of stock in several corporations is not enough in itself to justify considering the two corporations as one, the court said:
“ * * * where such ownership of stock is resorted to, not for the purpose of participating in the affairs of the corporation in which it is held in a manner normal and usual with stockholders, but for the purpose of making it a mere agent, or instrumentality or department of another company, the courts will look through the forms to the realities of the relation between the companies as if the corporate agency did not exist and will deal with them as the justice of the case may require.”
The evidence shows that the Acme Operating Corporation received no money except that paid upon affreightment contracts made either by the Steamship Corporations or itself after it had acquired the charter parties under which it bases its suit. The books show that an account was kept in which the amount received on account of each steamship was placed on the credit side and all sums paid on account of each steamship on the debit side of the ledger.
No charge or credit in relation to charter hire by defendant is included in any item or appears on the books of the Acme Operating Corporation. The charter parties made a number of provisions for certain payments by each party, which would have resulted in debits and credits if the charter parties *122 were carried out accordingly, but there is nothing in the evidence to show that any of these provisions were carried into effect.
It is true that the powers and liabilities of some of these entities, if they may be called such, were varied by the legal trappings with which they were clothed. But they were all created for one purpose, used for that purpose, and so far as matters vital to the case at bar are concerned these legal technicalities do not, in our judgment, affect the situation. It is possible that no one of the matters which we have mentioned would be sufficient by itself and alone to show the identity of these different concerns, but all the evidence tends in the same direction and as a whole abundantly satisfies us that these corporations were mere puppets of Miller and Stafford and moved in accordance with the manner in which they pulled the strings.
In the case of Luckenbach S. S. Co. v. W. R. Grace & Co., 267 Fed. 676, 681, where the identity of the corporations was if anything less clearly established than in the instant case, it was said:
“For all practical purposes the two concerns are one, and it would be unconscionable to allow the owner of this fleet of steamers * * * to escape liability because it had turned them over a year before to a $10,000 corporation, which is simply itself in another form.”
In this case, we think, it would be unconscionable to permit the plaintiff to recover when it derived any rights that it possessed from another corporation with which it was practically identical and which could not recover. In fact there are no equities upon which the case for plaintiff can rest. Under the contract executed with the steamship corporations and the transactions as carried out in accordance therewith, an indebtedness arose in favor of the Government instead of against it.
Holding as we do that the steamship corporations and the Operating Corporation, plaintiff herein, were merely masks behind which Miller and Stafford operated, the contract made with the Government by the steamship corporations, which by its terms was a settlement of all claims against the Government for the requisition of the vessels or the use of them, was binding alike on all of these dummies which Miller- *123 and Stafford bad set up and prevents a recovery by the plaintiff herein. This holding makes it unnecessary to consider many other objections urged against the recovery of plaintiff which would otherwise demand attention.
In this connection it should also be noted that on April 23, 1919, contracts were executed between the Operating Corporation on one side and the Acme Steamship Corporation and the Whitney Steamship Corporation on the other, containing provisions that released the steamship corporations from any and all liability arising out of any charter parties made with the Acme Operating Corporation, or on account of any improvements or alterations made on the vessels by the Operating Corporation, or Miller and Stafford, or by reason of any moneys expended on account of the vessels in any manner whatever, the release to operate against the vessels as well as the parties and assigning to the steamship corporations any claims which the Operating Corporation (plaintiff) might have had against the vessels, or against the Government by reason of taking over the vessels, or for damages or otherwise.
The plaintiff also claims that the vessels were not in good condition when they were returned by the Government and that a considerable sum had to be expended in repairing them, the amount of which it seeks to recover. We do not think the plaintiff is entitled to recover on this branch of the case. In the first place it appears that the intervenor paid out the money for reconditioning the vessels as will appear further on in the opinion and in any event the Government settled with Miller and Stafford and the corporations which nominally owned the steamships for the amount necessary to recondition them and under the principles laid down above the plaintiff was bound by this settlement.
A question also arises as to whether the court has jurisdiction of plaintiff’s case under the provisions of section 2 of the suits in admiralty act, which section has been held to grant exclusive jurisdiction to the district courts in cases where merchant vessels have been requisitioned by the Government and the Government subsequently entered into a contract for the operation thereof under what is known as a requisition charter. See Matson Navigation Co. v. United *124 States, 284 U. S. 352, decided by the Supreme Court January 4, 1932.
The case for plaintiff has been presented by its counsel on the theory that plaintiff had entered into a charter party not with the Government but with the owners of the steamships, acquired a lien thereon by virtue of provisions in the contract, and that its rights under the lien were injured by virtue of the Government’s requisition proceedings. We have held, however, that the evidence showed that plaintiff was bound by a contract which was made by other parties with the Government and which precluded any recovery by the plaintiff. This contract included, among other provisions, a charter party of the requisitioned vessels. If a judgment had been sought by the plaintiff under the provisions of this charter, it may be that we would have no jurisdiction of the case to determine it upon its merits; but we do not hold that the plaintiff is entitled to a recovery under any contract or charter made with the Government. On the contrary, we have held on the merits of the case that the contract made with the Government prevents any recovery against the defendant and that this is a sufficient reason for dismissing the petition. If we should also hold that the charter party entered into with the Government and executed nominally on behalf of the steamship companies is involved in plaintiff’s case and that by reason thereof the court has no jurisdiction to act on plaintiff’s petition, the same result would follow and the same order be made. We conclude therefore that it is not necessary to enter in the record more than our conclusion that plaintiff’s petition should be dismissed and a judgment carrying this determination into effect.
THE CLAIM OF THE INTERVENOR
In the opinion on the case of the plaintiff we have shown that the Fidelity Trust Company had prior to the requisitioning of the steamships acquired liens thereon consisting of a mortgage on the S. S. J. S. Whitney to secure the payment of a note for $150,000 which matured April 30, 1918, and a mortgage upon the S. S. H. M. Whitney to secure the payment of a note to it for $200,000 which matured June 4, 1918. *125 In addition to the mortgages to the Fidelity Trust Company, the J. S. Whitney was subject to the lien of the Valk & Murdock Company for repairs in the amount of $132,509.45, and the II. M. Whitney was subject to the hen of the Theodore A. Crane’s Sons Company for repairs in the amount of $253,640.33. The lien of the Yalk & Murdock Company in whole and the lien of Crane’s Sons Company in part were acquired by the Trust Company through purchase and the Trust Company through contract with the plaintiff took over the vessels, paid for repairs on them, and operated them in an attempt to recoup its investments. Neither the mortgages nor the hens were ever paid and the market price of the vessels so decreased that the hens were in excess of their value. Financial difficulties beset the Trust Company and it failed. Its assets passed under the control of the commissioner of banks for the Commonwealth of Massachusetts, and while being so controlled were sold to the Liberty Trust Company, intervenor herein. This sale included the mortgages and notes above described and the interest which the Fidelity Trust Company had at the time in the hens of the construction companies above mentioned, which had, as set forth above, repaired and changed the vessels. This sale or assignment was not of such a nature as would prevent this court from taldng jurisdiction of the claim of the intervenor.
The defendant, however, sets up the plea that the action of the intervenor is barred by the statute of limitations. This plea is based upon the proposition that the statute began to run at the time when the vessels were turned back by the Government. If this proposition is well founded, the plea would have to be sustained, as the intervenor’s petition was not filed until February 4, 1927. But we think that in this case the statute did not begin to run against the claim of the intervenor until it was rejected by the Shipping Board.
The act under which the steamships involved in this case were requisitioned (act of June 15, 1917, c. 29, 40 Stat. 182) provided in substance that the President should fix the amount of just compensation to be received by the party whose property had been requisitioned, and that if the person entitled to compensation was not satisfied with the amount allowed he was to be paid seventy-five per cent of *126 such amount and be entitled to sue the United States for the balance. By Executive order the President delegated the powers the act conferred upon him to the Shipping Board. The claim of the intervenor was first presented to the board in 1919, and negotiations took place between the representatives of the Fidelity Trust Company and the board with reference to a settlement of the claim. The board took no final action on the claim until sometime subsequent to February, 1921, when the claim was rejected. It will thus appear that the petition of the intervenor was filed within six years from the date of the rejection of its claim by the board. There is nothing in the evidence to show that the intervenor was guilty of any unreasonable delay which postponed the final decision of its claim, and, so far as the effect of the statute of limitations is concerned, the instant case is controlled by the decision in Smith v. United States, 67 C. Cls. 182, wherein the construction of the statute bearing thereon is discussed at length, and under a quite similar state of facts it was held that the action was not barred by the statute of limitations.
The question of whether the intervenor is entitled to recover on the merits of its case is a novel and difficult one. As a general rule where a third party takes possession of personal or chattel property and converts it to his own use, he becomes liable for the value of the property to another party having a mortgage thereon. But the circumstances of the instant case are peculiar and necessitate the determination of a new principle for which we find no direct precedents in the authorities.
The intervenor rests its case largely on the ground that the mortgages were executed in Massachusetts, and insists that under the Massachusetts law the Trust Company from which it derived its rights held the legal title to the vessels, and that therefore, when the defendant took over the vessels it became responsible for any depreciation in their value. It is also insisted on behalf of the intervenor that a party who causes damage to a lien holder by preventing the foreclosure of a lien, or by causing damage to the property to which the lien attaches, or depreciation in its value, becomes liable in damages. But we need not determine just how far *127 these rules would apply in ordinary cases where the only persons who had rights in the property involved were the mortgagor, the mortgagee, and a third party, for that is not the case before us. Nor need we consider what the effect would be in such cases under the Massachusetts rule where a third party undertook to appropriate and claim title to the property mortgaged, for, we think, it is not controlling in the case at bar. It should be especially noted that the Government did not take the titles to the steamships. It left the titles where they were before. What it took was possession of the ships, and it took this possession not from the Trust Company but from the United States marshals who respectively had custody of the vessels. The Trust Company at the time not only was not in possession of the ships but it was not even entitled to possession of the ships and did not become entitled thereto until after the Government had released the ships and the Trust Company had taken up the construction liens under which the United States marshals had previously held possession. It is urged in argument on behalf of the intervenor that it was useless for the Trust Company to foreclose its liens, because it could not take possession from the Government. It is true that the Government took possession of the ships shortly before the notes of the Trust Company became due and that the Trust Company could not obtain possession thereof until the Government had released its requisition, but it does not follow, in our opinion, that it would have been useless for the Trust Company to foreclose its liens and take such other proceedings as were necessary for it to obtain the right to possession of the ships when they were released from Government control. That there was nothing to prevent the Trust Company from taking the proper proceedings to establish its right to possession of the ships as against all parties except the defendant, is quite evident; and this, we think, is what it should have done to protect its rights. Had it done so, it then would have been in position to plead that but for defendant’s requisition it would be in possession of the ships, that the Government was taking the possession of the ships away from it, and it was being deprived thereof by the Government’s action. It might then have been argued that the Government should be required to pay just compensa *128 tion for depriving the Trust Company of this possession. But as the Trust Company was neither in possession of the ships nor entitled to have possession of the ships at the time the Government requisitioned them, we think it took nothing from the Trust Company thereby. It will be observed that at no time while the Government held possession of the ships was the Trust Company entitled to possession thereof if the Government released them. We think, therefore, it can not be said that the Government by taking possession of the ships and holding them for a limited time deprived the Trust Company of anything, and, consequently, the intervenor has derived from the Trust Company no right to receive compensation for this action.
It may be said that the defendant, by taking possession of the vessels, had converted them to its own use for the time being at least and therefore the Trust Company or its successors were entitled to recover for such conversion. But there are numerous cases which hold that an action for trover or conversion can not be maintained unless the plaintiff not only had title, general or special, but also either the right of immediate possession or was in the actual possession of the property and was wrongfully deprived thereof by the defendant. So also it has been held that an action in trover or for conversion can not be maintained by a mortgagee unless he has possession or a right to possession of the mortgaged property. See 11 C. J. 602, and the numerous cases cited under note 96.
It should be specially kept in mind that the intervenor does not bring this suit to recover the value of the use of the vessels during the time that the Government held possession. What it sues for is depreciation in their market value and for injury to their condition caused by use. It would seem that as the United States marshals held possession of the vessels at the time the Government took them over, if anyone was entitled to recover on account of the Government having taken and held possession of the vessels, it would be the United States marshals and not the intervenor. But, as we have observed above, there is no suit brought for the value of the use of the vessels while the Government held them, and it is not necessary for us to determine whether such a suit *129 could be maintained. What we have here is an action for depreciation in the market value of the vessels during the time that the Government held them, and so far as this action is concerned, we think, the intervenor at least is not entitled to maintain it for the reason that at that time it was not entitled to possession.
No one, we think, would claim that if the original mortgagors had kept possession of the vessels during the same period the Government held them, the mortgagors would be liable for the amount the vessels had depreciated in market value in addition to the mortgage debt. Conceding for the sake of the argument and for that purpose only that if some person had wrongfully taken from the mortgagors, or from the United States marshals, the possession of the vessels he would be hable for the depreciation thereof during the time he held them, it still must be said that we have no such case here. The Government did not wrongfully take possession of the vessels. On the contrary, it took possession rightfully under the statute and under the contract which it made -with the mortgagors. When it took this possession, either from the mortgagors or from the United States marshals, it took over the rights of the party who had theretofore been entitled to possession, and as far as the mortgagee was concerned it obtained the same rights by virtue of the statute which had been held by the party from whom the possession was taken. The original mortgagors, had they been in possession of the vessels at the time, could have leased them to the Government and the Government would in such circumstances be no more hable for damages on account of depreciation in the market value of the vessels than would the mortgagors themselves. We think the same rule applied when the vessels were taken from the United States marshals, who had the right of possession against everyone except the Government and could not be held hable for depreciation in value of the vessels during the time they were so held in custody, and for this reason also the intervenor is not entitled to recover on this branch of its claim.
The claim of the intervenor for compensation on account of the vessels being returned in a damaged condition appears to us to stand on a different basis. We think it is clear that the defendant was hable to someone for any damage done to *130 the vessels themselves. We do not understand counsel for defendant to dispute this general statement, but they insist that pursuant to a contract with the mortgagors the amount of damage to the vessels was agreed upon and the mortgagors given credit therefor in a settlement had with them. But we do not think this settlement disposes of the claim of the intervenor. The defendant acquired no higher right than the mortgagors could convey by contract, but the mortgagors could not convey or release any of the Trust Company’s rights in the property. That was something which only the Trust Company itself could do, and although the mortgagee may not be in possession or entitled to immediate possession he may bring an action in damages for an injury to his interest in the mortgaged property. See Adams & Frederick Co. v. South Omaha National Bank, 123 Fed. 641, and O’Brien v. Miller, 117 Fed. 1000. It is true that this rule only applies where possession is wrongfully taken and the property converted to the use of the wrongdoer. While the defendant did not wrongfully take possession of the vessels but took them pursuant to its war powers and under statute, it would still, as we think, be liable to pay just compensation therefor under the same principles as were the basis of the decisions last above cited. We have not undertaken, however, to determine whether these principles might in any case enable a mortgagee to recover for a depreciation in market value of the mortgaged property where a third party took possession of it temporarily and subsequently turned it back, for, we think, in any event the intervenor is not entitled to recover on this ground. But the injury to the vessels themselves was an injury to the res upon which it held a mortgage, and for such an injury, we think, the Government was hable. It is true that it gave credit to the mortgagors for the amount which the board of survey found was reasonable to pay to recondition the vessels, but, as we have heretofore shown, the mortgagors could not bind the intervenor by such a contract, and it is not a protection to the defendant. In this connection it ought to be said that a claim for damages on account of the condition in which the ships were returned is not specifically pleaded in the intervenor’s petition. The inter-venor has however in its petition a broad and sweeping prayer for general relief which we think is sufficient to cover this *131 claim under the liberal rules of pleading prevailing in this court, and it should be observed in this connection that this matter is specifically argued both by the intervenor and counsel for defendant without any objection being made on account of the indefinite nature of the pleadings or motion for a more specific statement.
There remains a question as to the sufficiency of the evidence to support this claim of the intervenor. There is no direct evidence that the amount which the intervenor seeks to recover was actually necessary to put the vessels in as good repair and condition as they were when the Government took them over, but no question is raised but what the vessels were in good condition when the Government took them. In fact, they were right out of the yards of the construction companies which had been making them over. As before stated, the mortgagors and the Shipping Board entered into a contract whereby the Shipping Board was to pay a certain amount for reconditioning each of the two vessels respectively, as fixed by the board of survey. The Government could hardly dispute that it would require at least the amount fixed by the board of survey to recondition the vessels, and this amount constitutes the greater portion of the intervenor’s claim. But the actual payment for these repairs was made by the Trust Company, together with other sums paid for further reconditioning of the vessels. So far as these amounts are concerned, the Government merely credited the mortgagors with the total amount agreed upon and made no payment. It is true that the stipulation shows that the Trust Company charged the amount so paid to the Acme and Whitney Steamship Corporations, but we think there is a reason for this in that the mortgagors, who had consented to the chartering of the vessels to the Government, might also be liable for this claim. We have already stated that we think the fact that the board of survey fixed a certain amount for the reconditioning of the vessels was sufficient to show that at least that amount was required to recondition the vessels, and while there is no direct evidence with reference to the other sums expended by the Trust Company for the same purpose we think it would be unreasonable to suppose or believe, when the liens of the construction companies and of the Trust Company so nearly *132 approached the whole value of the vessels, that the Trust Company would expend additional sums on them if it was not reasonably necessary to put them in proper condition. The evidence shows that the Fidelity Trust Company advanced and paid $55,377.26 for sundry services and materials in connection with the S. S. James S. Whitney after it was delivered by the Shipping Board, and also after the delivery of the S. S. H. M. Whitney the Trust Company paid for sundry services and materials in connection therewith $81,087.50, making a total paid on the two steamships of $136,464.76. The various items which made up these two expenditures all appear to be necessary expenses in reconditioning the ships except a total of $7,165 expended for lifeboats. Deducting this amount, there was expended by the Trust Company for reconditioning the ships $129,299.76, which we think the intervenor is entitled to recover together with interest from October 1, 1919. Judgment will be rendered accordingly in favor of the intervenor for that amount and dismissing the plaintiff’s petition.
Williams, Judge; Littleton, Judge; and Booth, Chief Justice, concur.
Whaley, Judge, took no part in the decision of this case on account of illness.

 These charter parties must be distinguished from the charter parties executed with the Government December 4,1918, and hereinabove referred to.