Avtar **HEIR** and **H & G Petroleum, Corp.,** Plaintiffs,

v.

**DELAWARE RIVER PORT AUTHORITY,** Defendant.

**Civil Action No. 01–5059(JEI).**

United States District Court, D. New Jersey.

Aug. 6, 2002.

Schiffman, Berger, Abraham, Kaufman & Ritter, P.C. by Richard G. Berger, Esq., David J. Wallman, Esq., Hackensack, NJ, for Plaintiffs.

Wolf, Block, Schorr and Solis Cohen LLP by Dante J. Romanini, Esq., Thomas Paolini, Esq., Myles Seidenfrau, Esq., Cherry Hill, NJ, for Defendant.

## AMENDED OPINION

IRENAS, District Judge.

Presently before the Court are Defendant Delaware River Port Authority's Motion for Summary Judgment and Plaintiffs Avtar Heir and H & G Petroleum Corp.'s Motion for Partial Summary Judgment. The dispute between the parties arises out of the Delaware River Port Authority's exercise of the power of eminent domain to take possession of a parcel of land on which Plaintiffs operated a franchised service station. Specifically, Plaintiffs claim an entitlement, under the Takings Clause of the Fifth Amendment to the United States Constitution, to "just compensation" for the loss of their franchised business as a result of the condemnation of the property upon which that business was situated. As is discussed below, because Plaintiffs failed to raise the claims asserted in the instant action in a prior proceeding in the New Jersey Superior Court, because the relief Plaintiffs seek is barred by the terms of their franchise agreement, and because the actions of the Defendant did not constitute a taking of any constitutionally-protected property possessed by Plaintiffs, Defendant's motion will be granted.

## I.

In November, 1990, Plaintiff Avtar Heir entered into a Franchise Agreement with the Mobil Oil Corporation in which Heir was granted the right to operate a branded service station and convenience store, upon property owned by Mobil, at 1836 Admiral Wilson Boulevard in Camden, New Jersey. This agreement was renewed three times, the final renewal occurring on August 19, 1997 and covering the period from January 1, 1998 until December 31, 2000. Under the terms of the Franchise Agreement, which incorporated a separate OG & L Lease Agreement ("Lease Agreement"), Heir leased the property owned by Mobil (known as the "Marketing Premises") and agreed to purchase certain minimum quantities of gasoline and, in return, was entitled to use of Mobil's trademarks and products. In addition, under the terms of the Franchise Agreement, Heir was permitted to establish a corporate entity to oversee operation of the marketing premises. Accordingly, Heir formed Plaintiff H & G Petroleum Corp. in November 1990.[1]

In early 2000, Mobil merged with Exxon Corp. and sold the Marketing Premises and Franchise Agreement to Tosco Marketing Corp. ("Tosco"). As a result of this transaction, all of Mobil's rights and obligations under the Franchise Agreement and the OG & L Lease were assigned to Tosco.

On April 28, 2000, the Delaware River Port Authority ("DRPA"), a public corporate entity created by the Commonwealth of Pennsylvania and the State of New Jersey, and exercising the power of eminent domain pursuant to N.J.S.A. 32:3–6, initiated condemnation proceedings in the New Jersey Superior Court against the Marketing Premises. As the occupier of the targeted premises, H & G was notified of the proposed taking pursuant to N.J.S.A. 20:3–10.[2] Pursuant to the terms of Avtar Heir's Franchise and Lease Agreements with Tosco, and the applicable law governing the parties' relationship, the condemnation of the business premises was an event giving rise to a right of termination in either party. Specifically, § 14.2 of the Franchise Agreement provided that "either party may terminate this Agreement ... if any federal, state or local governmental action results in the adoption or imposition of Laws that (a) significantly alter the reasonable expectations of the parties at the time of entering into this Agreement." (*See* Stip. of Facts, Ex. B at 28). This language tracks that of the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. § 2801, *et seq.*, the terms of which governed Heir's relationship with Mobil and Tosco. Generally, the PMPA forbids termination of the franchise relationship absent good cause. *See* 15 U.S.C. § 2802(a). However, under the PMPA, the condemnation of the marketing premises by the power of eminent domain

1. H & G is a New Jersey corporation and has four equal shareholders, Avtar Heir, Malkit Heir, Khushvider Mangat and Jatinder Kaur Deol. (*See* Stip. of Facts, ¶ 5).

2. While Avtar Heir did not separately participate in the state condemnation proceedings, he concedes that he was aware of those proceedings and did not feel it necessary to intervene as he considered himself and H & G as one and the same. (*See* Heir Dep. at 94–95, attached as Ex. "C" to Romanini Cert.). Indeed, Heir filed a certification in the Superior Court stating that H & G was the "franchisee" under the Franchise Agreement and H & G asserted numerous rights created by that Agreement in the Superior Court. Nevertheless, at oral argument, the Plaintiffs for the first time emphasized that Heir, as an individual, was not named in the condemnation proceedings. However, as is discussed further below, the Court does not see this distinction as bearing on the outcome of this case.

is an event "relevant to the franchise relationship and as a result of which termination of the franchise is reasonable." 15 U.S.C. § 2802(c)(5). Thus, upon notice of the DRPA's condemnation, Tosco was empowered to terminate, at its discretion, its franchise relationship with Heir.[3]

On January 27, 2000, counsel for Plaintiffs wrote to the DRPA seeking assistance in negotiating with Tosco for the establishment of a franchise at a new location, as "our client's business is not one which can be moved to a different location because it is a franchised Mobil Oil Service Station which may, under the Franchise Agreement, only be operated from a single premises ... unless some sort of arrangement can be made for Mobil Oil Corp. to transfer the franchise to another premises." (Stip. of Facts, Ex. C). On February 23, 2000, counsel for the DRPA responded to Heir's request, indicating that it was "willing to help in any way that it can to relocate entities which have been affected by [the condemnation]." (*Id.*, Ex. D).[4] On March 24, 2000, Plaintiffs' counsel wrote to Mobil, informing it of the noticed condemnation and requesting the right to relocate Plaintiffs' franchise to a new location. (*Id.*, Ex. F). In addition, counsel informed Mobil of his position that Plaintiffs were entitled under the Agreement to a portion of any condemnation award made by the DRPA. (*Id.*). On May 9, 2000, Tosco responded to Plaintiffs' request, indicating its inclination not to offer Heir another Mobil franchise and, on June 30, 2000, provided Plaintiffs with a formal Notice of Termination of the Franchise Agreement, effective July 7, 2000. (*Id.*, Ex.L).

In May 2000, H & G filed an Answer and Crossclaim in the Superior Court action, asserting that, pursuant to the Lease and Franchise Agreements, they were entitled to the portion of any condemnation award or settlement attributable to the "goodwill" of the business located on the condemned premises. On June 28, 2000, a commissioner's hearing, pursuant to N.J.S.A. 20:3–12, was held. At the hearing, as Mobil's (now Tosco's) agreements with Heir provided that Tosco possessed the "right to settle or dispute any condemnation proceedings in its sole discretion" (*see* Lease, Pl.Ex. B at § 3.4), Tosco entered into a settlement agreement, pursuant to which the sum of $ 852,000 would be paid for the condemned property. On September 7, 2001, a hearing to approve and apportion the settlement between Tosco and DRPA was held before the Honorable Francis J. Orlando of the New Jersey Superior Court. At this hearing, H & G was heard on its crossclaim that it was entitled to apportionment of the settlement proceeds. H & G did not explicitly assert a claim under the Fifth Amendment or § 1983 at the September hearing, nor did it argue that it was constitutionally entitled to an award for the loss of the goodwill of its business; instead, H & G limited its claim to an entitlement pursuant to the terms of the Franchise Agreement and the PMPA. (*See* Transcript of Sept. 7, 2001 Hearing, Ex. A to Romanini Cert.).

Ultimately, Judge Orlando concluded that Plaintiffs were not entitled to any compensation for the loss of their business goodwill, as no award for such losses was included in the sum paid by the DRPA to Tosco. In reaching this conclusion, Judge Orlando relied on the terms of the parties' various agreements and the provisions of the PMPA. Specifically, he concluded that

---

**3.** Neither party disputes that Tosco's ultimate termination of the Franchise Agreement was reasonable under the PMPA and in accordance with the terms of the Agreement.

**4.** The letter also indicated DRPA's belief that it was not obligated to compensate Plaintiffs' for the loss of their business.

the provision of the Lease which provides that "Franchise Dealer [Heir] has no interest whatsoever in ... sums [paid as a result of condemnation] except that Franchise Dealer may receive any sum payable by the condemning authority for loss of goodwill by Franchise Dealer" (*see* Lease, § 3.4) was clear and that it provided for an award of goodwill to the Plaintiffs only where a portion of the sum paid by the condemning authority was intended for such purpose. (*See* Transcript at 23–24). Further, Judge Orlando concluded that neither the PMPA nor New Jersey law required such an award to be made. (*Id.*). Accordingly, the full amount of the condemnation award, less $ 10,000 for moving and storage of business inventory, was awarded to Tosco. (*See id.;* Pl. Stmt. of Mat. Facts at § 14).

Plaintiffs did not appeal. Instead, they filed this action on November 1, 2001, alleging that the denial of compensation for the value of their franchise constituted an unlawful taking without just compensation in violation of the Fifth and Fourteenth Amendments to the Constitution and 42 U.S.C. § 1983. On April 17, 2002, the parties filed the instant motions for summary judgment. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

## II.

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)). In deciding a motion for summary judgment, because the role of the court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue

for trial," *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the Court must construe the facts and inferences in the light most favorable to the non-moving party. *Pollock v. American Tel. & Tel. Long Lines,* 794 F.2d 860, 864 (3d Cir.1986). Further, "a party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 248, 106 S.Ct. 2505 (citation omitted).

## III.

The Fifth Amendment to the United States Constitution prohibits the "taking" of "private property ... for public use, without just compensation." U.S. Const. amend. V. This guarantee, the Supreme Court has stated, "is designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Penn Central Transportation Co. v. City of New York,* 438 U.S. 104, 123, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) (*citing Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960)). In this case, Plaintiffs allege that the loss Avtar Heir's franchise and the loss of H & G's existing business as a result of the DRPA's condemnation of the Marketing Premises constituted a taking for which just compensation is owed. (*See* Pl. Br. in Opp. at 24).

In response to Plaintiffs' claims, the DRPA offers two basic arguments. First, the DRPA argues that, regardless of the nature of the interests at issue in this action, Plaintiffs' claims are barred in this Court by New Jersey's entire controversy doctrine and the principles of claim preclusion. Second, Defendant contends that Plaintiffs' claims for the loss of their franchise and business are barred by the express terms of the franchise and lease

agreements with Tosco and that, in any event, the condemnation of the Marketing Premises did not constitute a "taking" of any constitutionally-protected property. The Court will address each argument in turn.

### A.

The DRPA's first argument in this case is that because Plaintiffs had a "full and fair" opportunity to seek compensation for their losses in the state condemnation proceedings, their claims in this Court are barred by New Jersey's entire controversy doctrine and the traditional principles of claim preclusion (res judicata). The Federal Full Faith and Credit Statute, 28 U.S.C. § 1738, provides that "Acts, records and judicial proceedings" of any State,

> shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken.

As the Supreme Court has recognized, the rules of preclusion made applicable by this section apply as fully to claims pursuant to § 1983 as to any other claims. *See Migra v. Warren City School District Bd. of Ed.*, 465 U.S. 75, 85, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984) ("Section 1983, however, does not override state preclusion law and guarantee petitioner a right to proceed to judgment in state court on her state claims and then turn to federal court for adjudication of her federal claims."); *Allen v. McCurry*, 449 U.S. 90, 104, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980).

New Jersey's entire controversy doctrine is embodied in the New Jersey Constitution, *see* N.J. Const. art. VI, § 3, ¶ 4 (1947) (providing that the Law Division of the New Jersey Superior Court shall be permitted to grant such legal and equitable relief "so that all matters in controversy between the parties may be completely determined") and several of the New Jer-

sey Rules of Court, *see* N.J. Ct. R. 4:30A ("Non-joinder of claims required to be joined by the entire controversy doctrine shall result in the preclusion of the omitted claims to the extent required by the entire controversy doctrine."); R. 4:27–1 (permissive joinder of claims is subject to requirements of the entire controversy doctrine); R. 4:5–1(b)(2) (requiring in all cases a certification by each party that no other actions are pending or contemplated). Based on these general provisions, the courts of New Jersey have developed the entire controversy doctrine "to assure that all aspects of a legal dispute occur in a single lawsuit" and the doctrine, as presently understood, requires that "parties present all affirmative claims and defenses arising out of a controversy." *Olds v. Donnelly*, 150 N.J. 424, 431, 696 A.2d 633 (1997). Applying that standard, which federal courts are bound to do by virtue of the Full Faith and Credit Act, *see Rycoline Products, Inc. v. C & W Unlimited*, 109 F.3d 883, 887 (3d Cir.1997),

> if parties or persons will, after final judgment is entered, be likely to have to engage in additional litigation to conclusively dispose of their respective bundles of rights and liabilities that derive from a single transaction or related series of transactions, the omitted components of the dispute or controversy must be regarded as constituting an element of one mandatory unit of litigation.

*DiTrolio v. Antiles*, 142 N.J. 253, 268, 662 A.2d 494 (1995) (*quoting O'Shea v. Amoco Oil Co.*, 886 F.2d 584, 590–91 (3d Cir. 1989)). However, at its heart, the entire controversy doctrine is an equitable one and "the twin pillars of the entire controversy doctrine are fairness to the parties and fairness to the system of judicial administration." *Hillsborough Township Bd. of Ed. v. Faridy Thorne Frayta, P.C.*, 321 N.J.Super. 275, 284, 728 A.2d 857 (App.Div.1999) (*quoting Gelber v. Zito Partnership*, 147 N.J. 561, 565, 688 A.2d

1044 (1997)). Thus, "in considering fairness to the party whose claim is sought to be barred, a court must consider whether the claimant had a 'fair and reasonable opportunity to have fully litigated the claim in the original action.' " *Id.*[5]

 A general consideration of the issues involved in this case leads to the conclusion that the entire controversy doctrine should apply to the claims presently asserted by Plaintiffs. "In determining whether successive claims constitute one controversy for purposes of the doctrine, the central consideration is whether the claims ... arise from related facts or the same transaction or series of transactions." *DiTrolio,* 142 N.J. at 267, 662 A.2d 494. Here, there is little question that Plaintiffs' claimed right to compensation for their lost franchise arises from the same trans-

action as was at issue in the Superior Court. Further, as Defendant points out, it entered into a settlement with Tosco with the understanding that the amounts paid pursuant to that settlement fulfilled all of its compensatory obligations with regard to the Marketing Premises. (*See* Cert. of David G. Murphy, Ex. B to Romanini Cert.). Indeed, as required by law, H & G was joined in the condemnation proceeding for the very purpose of assuring that all claims with respect to the condemned property would be addressed in a single proceeding. Thus, the fairness considerations which form the heart of the entire controversy doctrine counsel in favor of the doctrine's application in this case.[6]

However, Plaintiffs contend that the entire controversy doctrine does not apply to

**5.** As noted above, although Avtar Heir was not named as a defendant in the Superior Court proceedings, the Court does not see this circumstance as affecting the application of the entire controversy doctrine to this action. While Heir was nominally the only party to the Franchise and Lease Agreements, it is clear that those agreements were intended to benefit H & G and all its shareholders, rather than Heir individually, and that the real party in interest in this action is H & G. Indeed, H & G has, throughout both proceedings, asserted on its own behalf rights created by Heir's agreements with Tosco and, in the Superior Court, Heir stated that, notwithstanding the formalities of his contracts with Mobil, the real party to the Franchise and Lease Agreement is H & G. (*See* Stip. of Facts, Ex. Y). Accordingly, as Heir himself conceded, he and H & G are "one and the same" and the rights asserted by him in this action are identical to those at issue in the Superior Court. Therefore, the Court concludes that the entire controversy doctrine applies as equally to the claims asserted by Avtar Heir as to those brought by H & G. Additionally, the Court notes that, if Heir were deemed to be asserting rights distinct from those at issue in the New Jersey Superior Court, he would be barred, under the Supreme Court's decision in *Williamson County Regional Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985), from as-

serting those claims in this Court unless and until he first asserted those claims in an inverse condemnation action in the New Jersey courts. 473 U.S. at 195, 105 S.Ct. 3108 ("If a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used that procedure and been denied just compensation.").

**6.** For substantially the same reasons, the Court concludes that the application of the traditional principles of claim preclusion, or res judicata, also bars Plaintiffs' claims. "Claim preclusion refers to the effect of a judgment in foreclosing litigation of a matter that never has been litigated, because of a determination that it should have been advanced in an earlier suit." *Peduto v. City of North Wildwood,* 696 F.Supp. 1004, 1007 (D.N.J.1988) (*quoting Migra,* 465 U.S. at 77 n. 1, 104 S.Ct. 892). As the Third Circuit has recognized, the entire controversy doctrine "is essentially New Jersey's specific, and idiosyncratic, application of traditional res judicata principles" and the two doctrines "although sometimes approached as if they belong to two different families ... are blood relatives." *Rycoline Prods., Inc.,* 109 F.3d at 886. Under New Jersey law, claim preclusion will apply to bar subsequent claims where 1) the first judgment is valid,

their federal claims as they were denied a fair and reasonable opportunity to have those claims considered by the New Jersey Superior Court. According to Plaintiffs, their federal claims could not have been raised in the state proceedings for two reasons: 1) because, under the Supreme Court's decision in *Williamson County Regional Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985), their federal claims "were not ripe"; and 2) because they were limited by New Jersey's eminent domain procedures, and the terms of their lease, to the claims asserted under state law. (*See* Pl. Br. in Opp. at 2). However, as is discussed below, Plaintiffs' characterization of the nature of their federal claims, and the New Jersey state proceedings, is inaccurate.

In *Williamson County*, the Supreme Court held that, because the Fifth Amendment does not prohibit all governmental takings, but only those that occur "without just compensation", a state's action is not "complete", and a plaintiff's claims in federal court not ripe, "until the State fails to provide adequate compensation for the taking." 473 U.S. at 195, 105 S.Ct. 3108. Based on this decision, Plaintiffs here assert that they "could not state a claim [in state court] for a violation of the Just Compensation Clause until they had been denied just compensation under the condemnation procedures mandated by state law." (Pl. Br. in Opp. at 4). However, the fact that Plaintiffs could not have asserted their § 1983 claims in federal court at the time of their state proceedings does not mean that they could not, and need not, have asserted those claims in state court.

The "basic rationale" of the ripeness doctrine "is to prevent courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Armstrong World Indus., Inc. v. Adams*, 961 F.2d 405, 411 (3d Cir. 1992) (*quoting Abbott Labs. v. Gardner*, 387 U.S. 136, 148, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)). "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 299, 118 S.Ct. 1257, 140 L.Ed.2d 406 (1998) (internal citation omitted); *see also*, 13A Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure: Civil 2d*, § 3532 (2002). Thus, while the claims asserted by Plaintiffs in this case, like those at issue in *Williamson County*, would have been unripe had they been asserted in federal court prior to the decision in the state condemnation proceedings, it does not necessarily follow that those claims could not have been asserted before the state court. Indeed, the assertion of their constitutional claims in state court, which would have permitted the state judge to confront the possibility of a constitutionally infirm condemnation award, serves the most important purposes of the entire controversy doctrine, the avoidance of needless multiplication of proceedings, and is consistent with the concern of the ripeness doctrine that federal courts avoid decisions that are likely to be rectified in state or administrative proceedings. In fact, the Third Circuit has expressly held that the use of the entire controversy doctrine to bar the assertion of constitutional claims in subse-

final and on the merits; 2) the parties to the later action are identical to or in privity with those in the first action; and 3) the claim in the second action grows out of the same transaction or occurrence as the earlier one. *Fisher v. Yates*, 270 N.J.Super. 458, 470, 637

A.2d 546 (App.Div.1994) (*citing Watkins v. Resorts Int'l Hotel & Casino*, 124 N.J. 398, 412, 591 A.2d 592 (1991)). Consideration of the facts of this case makes clear that each of these three elements is satisfied.

quent federal court proceedings does not contravene due process or the Supreme Court's decision in *Williamson County*. *See Peduto v. City of North Wildwood*, 878 F.2d 725 (3d Cir.1989).

In *Peduto*, the Court of Appeals considered whether "the interplay between federal takings jurisprudence and New Jersey's Entire Controversy Doctrine denied [plaintiffs] an opportunity to litigate their claims in federal court, thereby denying them due process." 878 F.2d at 727. After noting that "a federal court can refuse to accord preclusive effect to a state court judgment if application of the state preclusion law would violate due process," *id.* at 728, and recognizing that the operation of *Williamson County* and the entire controversy doctrine required that plaintiffs assert their federal claims in state court, *id.* at 729, the court nevertheless held that the application of the entire controversy doctrine in such circumstances does not amount to a violation of due process: "denial of a federal forum, however, does not amount to a denial of due process.... Appellants have exhausted their state claims, which, under *Williamson* is a necessary predicate to their federal cause of action; but in doing so, they received a full and fair adjudication of their constitutional claims against the City in state court. Due process guarantees them no less, but entitles them to no more." *Id.* While it is true, as Plaintiffs point out, that the plaintiffs in *Peduto* actually litigated their federal claims in the state proceedings, the Third Circuit's decision is equally applicable to the instant case, as its fundamental holding was that the entire controversy doctrine, a doctrine whose very purpose is to bar unasserted claims in subsequent actions, may be applied to bar federal claims in takings cases. *See id.* It should also be noted that the Third Circuit's holding in *Peduto* appears to be consistent with that of the majority of federal courts to have considered the issue. *See, e.g., Wilkinson v. Pitkin County Bd. of County Commissioners*, 142 F.3d 1319, 1323 (10th Cir.1998) (concluding "that the *Williamson* ripeness requirement is insufficient to preclude application of res judicata and collateral estoppel principles in this case" and that plaintiffs were therefore required by Colorado law to assert their federal claims in state court); *Front Royal and Warren County Indus. Park Corp. v. Town of Front Royal*, 135 F.3d 275, 283 (4th Cir. 1998); *Palomar Mobilehome Park Ass'n v. City of San Marcos*, 989 F.2d 362, 365 (9th Cir.1993) ("We are compelled to conclude that res judicata bars Palomar's claims in federal court, despite the requirements of *Williamson*."); *Fields v. Sarasota Manatee Airport Auth.*, 953 F.2d 1299, 1303 (11th Cir.1992) ("Most state courts recognize res judicata and collateral estoppel doctrines that would require a state court litigant to raise his federal constitutional claims with the state claims, on pain of merger and bar of such federal claims in any attempted future proceeding."); *Rainey Bros. Construction Co. v. Memphis and Shelby Cty. Bd. of Adjustment*, 967 F.Supp. 998, 1004 (W.D.Tenn.1997) (agreeing with those courts that have found that "the interaction between *Williamson County* and the Full Faith and Credit Act requires that a plaintiff landowner assert his federal claims in state court"). Accordingly, the Court concludes that the Supreme Court's holding in *Williamson County* does not prevent the application of New Jersey's entire controversy doctrine to this case.[7]

---

**7.** Although not explicitly stated, Plaintiffs' arguments regarding the entire controversy doctrine are premised on the argument that it is unfair that a takings plaintiff may be denied the right to assert his or her federal claims in a federal forum. While this argument was explicitly rejected in *Peduto*, the Court also notes that Plaintiffs did not inform the state

Plaintiffs also assert that the entire controversy doctrine is inapplicable because they could not have raised their federal claims in the state condemnation proceeding. Specifically, they contend that:

> both the provisions of the Lease Agreement and the Unit Rule governing condemnation proceedings expressly limited the scope of the prior condemnation proceedings. By no stretch of the imagination were the plaintiffs given a full and fair opportunity to litigate their federal claims in the prior State Court proceedings. Plaintiffs did not assert these claims because they could not.

(Pl. Br. in Opp. at 11). While Plaintiffs citation of the applicable legal principles is correct in that a plaintiff is not barred in a second action from asserting claims that could not have been raised in the first, *see Watkins v. Resorts Int'l Hotel and Casino, Inc.*, 124 N.J. 398, 413, 591 A.2d 592 (1991) (*citing Restatement (Second) of Judgments* § 25 comment e (1971)), their characterization of the condemnation proceedings in the New Jersey Superior Court, and the scope of their role therein, appears to be inaccurate.

"Application of the entire controversy doctrine requires equality of forum, that is, the first forum must have been able to provide all parties with the same full and fair opportunity to litigate the issues and with the same remedial opportunities as the second forum." *Hernandez v. Region Nine Housing Corp.*, 146 N.J. 645, 661, 684 A.2d 1385 (1996). Accordingly, the entire controversy doctrine will not bar a plaintiff's claims where the first proceeding "provided a limited forum for the adjudication of a narrow issue." *Rhodes v. Township of Saddle Brook*, 980 F.Supp. 777, 785 (D.N.J.1997). In this case, however, there is no indication that Plaintiffs could not have raised their federal claims before the New Jersey Superior Court.

As mentioned above, the New Jersey Constitution empowers the Superior Court, Law Division to address all claims "so that all matters in controversy between the parties may be completely determined." N.J. Const., art. VI, § 3, ¶ 4. While Plaintiffs contend that the condemnation proceeding was limited to a determination of whether they were entitled to compensation for the loss of goodwill resulting from the DRPA's condemnation, any such limitation was the result of Plaintiffs' own actions, not those of the state court. As the New Jersey Supreme Court has noted, "the joinder determination does

court of their desire to maintain their constitutional claims for later adjudication, a statement which was arguably required by the certification requirement of New Jersey Civil Practice Rule 4:5–1(b)(2). While still an open issue in the Third Circuit, *see Peduto*, at 729 n. 5 ("[W]e do not reach the question of whether an *England*-type reservation was available."), a number of courts have held that a plaintiff may "reserve" his or her federal claims by informing the state court of his or her intention to do so. *See Front Royal and Warren County Indus. Park Corp. v. Town of Front Royal*, 135 F.3d 275, 283 (4th Cir.1998); *Dodd v. Hood River County*, 59 F.3d 852, 862 (9th Cir.1995) (res judicata did not bar federal claims since plaintiffs reserved those claims and defendants and state court did not object to claim splitting); *Fields v. Sarasota Manatee*

*Airport Auth.*, 953 F.2d 1299, 1305–1306 (11th Cir.1992) (a reservation of the right to bring a claim in federal court may be made by "would-be federal court litigants who are forced to pursue state court proceedings in order to satisfy exhaustion requirements imposed by federal law incident to a takings claim"); *Peduto v. City of North Wildwood*, 696 F.Supp. 1004, 1011 (D.N.J.1988) (Brotman, J.) ("The proper way for the plaintiffs to challenge the application of New Jersey claim preclusion rules to their situation would have been to have sought mandamus from the Superior Court while specifically withholding or reserving any questions of federal law for a later federal court action."). However, since Plaintiffs made no attempt to make such a reservation, the efficacy of such an action need not be addressed here.

not repose with the parties. It is the trial court's responsibility to determine whether or not joinder is appropriate in a given case, and this litigant should be compelled to bring all actions at one time.... A plaintiff's failure to allow the trial court to manage the full controversy at the outset diminishes the force of any later claim that joinder would have been inappropriate." *DiTrolio* at 274–275, 662 A.2d 494; *see also, Rhodes* at 785 (noting New Jersey courts' emphasis that entire controversy determinations are properly made by the court, not the parties).

As Plaintiffs point out, it is well-settled that New Jersey follows the so-called "Unit Rule" in assessing and allocating just compensation for governmental takings. Pursuant to this approach, a single award for the value of the taken property is made, and the award is then apportioned among all parties having a claim thereto in a separate allocation proceeding. *See* R. 4:73–9 (2002); *New Jersey Sports and Exposition Auth. v. East Rutherford*, 137 N.J.Super. 271, 279, 348 A.2d 825 (1975). However, this procedure does not foreclose the ability of the Plaintiffs to assert their rights, under both state and federal law, to any portion of any award that is ultimately made. *See, e.g., State v. Hess Realty Corp.*, 226 N.J.Super. 256, 543 A.2d 1050 (App.Div.1988), *aff'd* 115 N.J. 229, 557 A.2d 1372 (1989) (considering claim of entitlement to compensation for value of lost franchise); *Jersey City Redevelopment Agency v. Exxon*, 208 N.J.Super. 53, 504 A.2d 1207 (App.Div.1986) (considering claim that value of franchise should be compensated and that failure to provide such compensation violated due process and equal protection). While condemnation proceedings are summary proceedings under the New Jersey Rules of Court, *see*

R. 4:73–1 ("An action in condemnation shall be brought in the Superior Court in a summary manner pursuant to R. 4:67."), the entire controversy doctrine has been deemed to apply to such proceedings, *see Perretti v. Ran–Dav's County Kosher, Inc.*, 289 N.J.Super. 618, 624, 674 A.2d 647 (App.Div.1996) (entire controversy doctrine applicable to summary proceedings); *Rhodes*, 980 F.Supp. at 787 ("The summary nature of the proceeding does not alter the outcome in this case because plaintiffs should have sought leave of court to assert a counterclaim."); *cf. Oliver v. Ambrose*, 152 N.J. 383, 393, 705 A.2d 742 (1998) (entire controversy doctrine applies in custody actions), as a party may assert any counterclaims, federal or otherwise, upon leave of court. *See* R. 4:67–4(a). Indeed, Plaintiffs in this case sought, and were permitted, to assert counterclaims to recover the goodwill allegedly destroyed by Defendant's actions. However, they made no attempt to obtain leave to assert their federal claims.[8] Further, while Plaintiffs contend that their participation in the condemnation proceedings was limited by the terms of the Lease Agreement with Mobil, any such limitations act as prohibitions on Plaintiffs' substantive rights to recovery, not as a bar to the assertion of those rights. Thus, the arguments made in this Court, that Plaintiffs are constitutionally entitled to compensation for the value of their franchise and business notwithstanding the waiver provision contained in the Lease Agreement, could have been as easily asserted in the New Jersey Superior Court as in this forum.

In conclusion, while Plaintiffs did not assert their federal claims in the state court proceedings to which they were a

---

**8.** Had Plaintiffs informed the Superior Court of their constitutional claims, and been denied the opportunity to assert those claims, there would be no question of the propriety of the instant action.

party, this was the result of their own decisions rather than any obstacles erected by the state court or the New Jersey law of eminent domain. While due process obligates a state to provide a party who endures a taking of constitutionally-protected property with an opportunity to assert his or her rights, the onus is not entirely upon the government, as a party seeking compensation has an obligation to assert its rights in a timely fashion so that the state court may address completely the dispute before it and the condemning authority may satisfy its compensatory obligations in a single action. Here, New Jersey provided Plaintiffs with a forum in which to assert their claims, yet Plaintiffs chose not to avail themselves of that forum, thereby undermining the finality and fairness of the DRPA's initial condemnation award. For that reason, the Court concludes that the entire controversy doctrine properly bars the instant suit.

### B.

Even were the entire controversy doctrine not to bar the claims asserted in this case, Plaintiffs would not be entitled to compensation for the losses resulting from the DRPA's actions. While Plaintiffs contend that they "had a constitutionally protected private property interest in their business," (Pl. Br. at 27), the Court concludes that the value of the franchise "destroyed" by the DRPA's condemnation is not a loss for which compensation is obligated under the Takings Clause and that the Defendant's actions did not effect a "taking" of that property.

It is a "basic axiom that 'property interests ... are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'" *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1001, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984) (*quoting Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)). In arguing that they are entitled to compensation for the losses alleged, Plaintiffs emphasize the contractual nature of the franchise relationship and analogize their interests to those of a lessee. According to this argument, the destruction of their franchise is akin to the condemnation of a leasehold, an event which, in certain cases, gives rise to a constitutional right to compensation. *See, e.g., Alamo Land & Cattle Co., Inc. v. Arizona*, 424 U.S. 295, 96 S.Ct. 910, 47 L.Ed.2d 1 (1976); *Devines v. Maier*, 665 F.2d 138 (1981); 2 *Nichols on Eminent Domain*, § 5.02[6] ("Courts have held that lessees for years, from year to year, or by statute ... have such an interest in property as to be classed as 'owners' in the constitutional sense, and are entitled to compensation for the taking of their interest."). However, while leaseholds, and contracts generally, have been recognized as property within the meaning of the Fifth Amendment, *see, e.g., Tahoe–Sierra Preservation Council v. Tahoe Regional Planning* Agency, —— U.S. ——, ——–——, 122 S.Ct. 1465, 1478–79, 152 L.Ed.2d 517 (2002) ("Compensation is mandated when a leasehold is taken and the government occupies the property for its own purposes."); *Omnia Commercial Co. v. United States*, 261 U.S. 502, 508, 43 S.Ct. 437, 67 L.Ed. 773 (1923), the right to compensation extends only as far as a party's contractual rights permit. *See, e.g., Nichols* at § 5.02[6][b] (A tenant pursuant to a lease containing a provision providing for termination upon condemnation "has no estate or interest in the property remaining after the taking to sustain a claim for compensation.").

■ As noted above, the various agreements between Avtar Heir and Mobil Oil provided that either party possessed an unequivocal right to terminate the franchise relationship upon condemnation of the Marketing Premises. Such a provision is expressly countenanced by the PMPA.

*See* 15 U.S.C. § 2802(c)(5). In *United States v. Petty Motor Co.*, the Supreme Court noted the general effect of condemnation clauses upon a party's right to receive compensation:

> The Tool Company had contracted away rights that it might otherwise have had. We are dealing here with a clause for automatic termination of the lease on a taking of property for public use by governmental authority. With this type of clause, at least in the absence of a contrary state rule, the tenant has no right which persists beyond the taking and can be entitled to nothing.

327 U.S. at 376, 66 S.Ct. 596. Here, as in *Petty Motor Co.*, Plaintiffs contracted away their right to the continuation of their franchise beyond the condemnation of the Marketing Premises (*see* Franchise Agreement at § 14.2). In such circumstances, Plaintiffs have no reasonable expectation of the continuation of their franchise and are therefore not entitled to any compensation for the losses resulting from the DRPA's actions. *Accord Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005–06, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984) (because owner of trade secrets was "on notice" of public disclosure, statutory provision requiring registration of pesticides did not effect a taking as owners had no "reasonable, investment-backed expectation of confidentiality"); 767 *Third Avenue Associates v. United States*, 48 F.3d 1575, 1579 (Fed.Cir.1995) (Lessor had no right to compensation for leases destroyed by government's closing of foreign offices because lessor "could not have had any reasonable investment-backed expectation to be free from government interference"); *Adams Parking Garage v. City of Scranton*, 171 F.Supp.2d 417, 424–25 (M.D.Pa. 2001), *aff'd* 2002 WL 465992, at *3, 33 Fed.Appx. 28 (3d Cir.2002) (Where lease contained provision permitting termination upon condemnation and lessee "was not entitled to a longer lease under state law, [lessee] was not deprived of a cognizable property interest.").[9]

9. The Court also notes another possible contractual limitation on Plaintiffs' entitlement to the compensation sought in this case. The Lease Agreement between Avtar Heir and Mobil provides that the "Franchise Dealer" has no interest whatsoever in any sums paid "by a condemning authority for a taking of any portion of the Marketing Premises," "except that Franchise Dealer may receive any sum payable by the condemning authority for loss of goodwill by Franchise Dealer." (Lease, § 3.4). Accordingly, by the clear language of this provision, it appears that Plaintiffs have no claim to any amounts attributable to any property other than goodwill. Further, Plaintiffs expressly state that they "are not, as defendant would have this Court believe, trying to take a 'second bite at the apple' by now seeking uncompensable 'consequential' damages, lost profits *or goodwill.*" (Pl. Br. in Opp. at 23). "Generally stated, federal standing requires an allegation of a present or immediate injury in fact, where the party requesting standing has 'alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues.' There must be some causal connection between the asserted injury and the challenged action, and the injury must be of the type 'likely to be redressed by a favorable decision.' " *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 804, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985); *see also, The Pitt News v. Fisher*, 215 F.3d 354, 359 (3d Cir.2000); *Doe v. Nat'l Bd. of Med. Exam'rs*, 199 F.3d 146, 152–53 (3d Cir.1999). Thus, by virtue of their contractual waiver and the asserted nature of the interest at issue in this action, it appears that Plaintiffs may lack standing to seek compensation for the losses alleged. *See New Jersey Sports and Exposition Auth. v. Borough of East Rutherford*, 137 N.J.Super. 271, 279, 348 A.2d 825 (Law Div.1975) ("Where the leasehold terminated under a valid condemnation clause and the tenant by contract gives up his claim to any part of the award as to the value of his leasehold, he then lacks standing to participate in the condemnation as to the land value."); *cf. Barclays Bank P.C. v. 865 Centennial Avenue Assoc.*, 26 F.Supp.2d 712, 721 (D.N.J.1998) (a tenant may waive the right to

Even were the Court to ignore the express language of the Plaintiffs' contracts, it would nevertheless conclude that compensation is not warranted in this case as, due to the nature of the DRPA's actions and the interests affected, no compensable taking of Plaintiffs' property has occurred. In pursuing their claims, Plaintiffs contend that they are seeking compensation only for the value of the "franchise" and the "existing business that was dependent on the franchise" affected by the DRPA's condemnation. (*See* Pl. Br. in Opp. at 24). These damages, they assert, are "direct" and therefore compensable under the Fifth Amendment. Defendant, on the other hand, contends that Plaintiffs are merely seeking compensation for "consequential" losses which do not fall within the scope of the Constitution's just compensation requirement.

■ In their papers, Defendants emphasize the "intangible" nature of the damages sought by Plaintiffs and argue that such damages are not compensable under the Takings Clause. The settled rule in New Jersey is that, in general, consequential losses caused by the exercise of eminent domain, such as the loss of goodwill, are not compensable. *City of Trenton v. Lenzner*, 16 N.J. 465, 476–77, 109 A.2d 409 (1954); *State v. Gallant*, 42 N.J. 583, 587, 202 A.2d 401 (1964). Indeed, the New Jersey courts have expressly held that the loss of a franchise as a result of a condemnation is not a compensable taking under state law. *See Commissioner of Transportation v. Hess Realty Corp.*, 226 N.J.Super. 256, 262, 543 A.2d 1050 (App. Div.1988), *aff'd* 115 N.J. 229, 557 A.2d 1372 (1989) ("The condemnee is not enti-

tled to any independent compensation for the value of the business located on the condemned property ... and neither the loss of the business nor a loss of a franchise is a separate compensable item."); *Jersey City Redevelopment Agency v. Exxon Corp.*, 208 N.J.Super. 53, 57, 504 A.2d 1207 (App.Div.1986). While it is of course true that "a State may not sidestep the Takings Clause by disavowing traditional property interests long recognized under state law," *Phillips v. Washington Legal Foundation*, 524 U.S. 156, 167, 118 S.Ct. 1925, 141 L.Ed.2d 174 (1998), the rule in New Jersey is consistent with the mandates of the Constitution. *Accord Division of Admin., Dept. of Trans. v. Ely*, 351 So.2d 66, 69 (Fla.Dist.Ct.App.1977) ("Damages to a business located on land appropriated in an eminent domain proceeding do not constitute part of the constitutionally protected right of just compensation for the public taking of private land and are compensable only if allowed by statute."). "Traditionally, damage to a business (as opposed to the taking or damaging of its physical assets) has been treated as a noncompensable loss, even when the damage or destruction occurs because a condemning agency takes the actual land on which the business is conducted." 8A *Nichols on Eminent Domain*, § 29.01[1]; *see also, United States v. Petty Motor Co.*, 327 U.S. 372, 377–78, 66 S.Ct. 596, 90 L.Ed. 729 (1946) ("Evidence of loss of profits, damage to good will, the expense of relocation and other such consequential losses are refused in federal condemnation proceedings."); *United States v. General Motors Corp.*,

---

condemnation proceeds "if the lease contains a contractual provision whereby the tenant surrenders all proceeds arising from a taking to the landlord"). However, as is discussed below, because the Court does not view the interests asserted by Plaintiffs as entirely distinct from property in the nature of goodwill,

and because the proper construction of the Plaintiffs' waiver of the right to condemnation proceeds may not be entirely clear, the Court will not conclusively determine the issue of the Plaintiffs' standing with regard to the specific damages sought in this case.

323 U.S. 373, 379, 65 S.Ct. 357, 89 L.Ed. 311 (1945) ("Compensation ... does not include ... the loss of goodwill."); *United States v. 50 Acres of Land,* 469 U.S. 24, 33, 105 S.Ct. 451, 83 L.Ed.2d 376 (1984) (recognizing "prior holdings that the Fifth Amendment does not require any award for consequential damages arising from a condemnation").

"While different jurisdictions vary slightly in their definitions of goodwill, the term generally is used to describe that component of value attributed to a business' reputation in the community, loyal customer base and ability to attract new customers." 8A Patrick J. Rohan and Melvin A. Reskin, *Nichols on Eminent Domain,* § 29.01[1] (1982). As mentioned above, by virtue of their franchise and lease agreements with the Mobil Oil Company, Plaintiffs were authorized to sell Mobil gasoline and oil at their service station and to use Mobil's trademarks in connection with those sales. Through this arrangement, Plaintiffs were able to take advantage of the accumulated goodwill and name recognition associated with Mobil. However, their franchise was not exclusive, as the Franchise Agreement specifically established that the Agreement and the relationship created thereby "do not give Franchise Dealer an exclusive right in any market or geographic area to sell the Products or conduct any of the Businesses. At Mobil's sole discretion, it may compete with Franchise Dealer...." (*See* Franchise Agreement, § 1.3). The value of Plaintiffs' interests, therefore, derived from the right to use and benefit from the accrued goodwill and brand recognition associated with the Mobil trademarks. Accordingly, the Court views the damages sought here as akin to the loss of goodwill and other business damages. *Accord Hess,* 226 N.J.Super. at 262, 543 A.2d 1050 (noting that claim for compensation for loss of franchise is similar to claim of entitlement to goodwill).

Despite the general rules stated above, however, in certain cases, compensation for business losses may be mandated by the Constitution. According to Plaintiffs, this is such a case, as the destruction of their franchise was the "inevitable effect" of the DRPA's actions. The Court, however, disagrees. While Plaintiffs suggest that the instant case is analogous to those exceptional cases in which goodwill was found compensable, such as *Kimball Laundry Co. v. United States,* 338 U.S. 1, 69 S.Ct. 1434, 93 L.Ed. 1765 (1949), those cases are inapposite, as the DRPA did not take Plaintiffs' franchise as a going concern, but instead obtained only real property to which Plaintiffs' franchise was an incident.

"The Fifth Amendment concerns itself solely with the 'property', i.e., with the owner's relation as such to the physical thing and not with other collateral interests which may be incident to his ownership." *General Motors Corp.,* 323 U.S. at 378, 65 S.Ct. 357. Accordingly, "not every destruction or injury to property by governmental action has been held to be a 'taking' in the constitutional sense." *Armstrong v. United States,* 364 U.S. 40, 48, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960); *see also, Unity Real Estate Company v. Hudson,* 977 F.Supp. 717, 724 (W.D.Pa.1997) (discussing line of Supreme Court cases holding that consequential damages, such as the loss of goodwill, are not compensable). In *Kimball Laundry,* a case upon which both parties rely, the United States Army took possession of a plant owned by the Kimball Laundry Company for use as a laundry for the Army's Seventh Service Command. 69 S.Ct. at 1437. In its decision, the Court held that additional compensation for the goodwill or "going-concern value" of the business was mandated by the Takings Clause. *Id.* at 1441. In so holding, Justice Frankfurter distinguished those cases in which "the taker fully occu-

pies the owner's shoes" from those in which compensation for goodwill is not owed:

> What, then, are the circumstances under which the Fifth Amendment requires compensation for such an intangible? Not, indeed, those of the usual taking of fee title to business property, but the denial of compensation in such circumstances rests on a very concrete justification: the going-concern value has not been taken. Such are all the cases, most of them decided by State courts under constitutions with provisions comparable to the Fifth Amendment, in which only the physical property has been condemned, leaving the owner free to move his business to a new location. In such a situation there is no more reason for a taker to pay for the business' going-concern value than there would be for a purchaser to pay for it who had not secured from his vendor a covenant to refrain from entering into competition with him.... The situation is otherwise, however, when the Government has condemned business property with the intention of carrying on the business ... if, in such a case, the taker acquires going-concern value, it must pay for it.

*Id.* at 1440–41. Plaintiffs here contend that the losses they have suffered are "direct damages" falling within the rule of *Kimball Laundry*. However, the DRPA did not directly acquire the goodwill associated with Plaintiffs' business, nor could it take advantage of that goodwill, as such value was the creation of Plaintiffs' contractual relationship with Mobil and Tosco. While the value of Plaintiffs' franchise was unquestionably destroyed, this was the result of Tosco's decision to terminate that arrangement rather than continue it at another location.[10] In such a situation, where the government does not "step into the owner's shoes", no obligation to pay is created. *See Home Savings of America, F.S.B. v. United States,* 51 Fed. Cl. 487, 495 (2002) (*citing Omnia Commercial Co. v. United States,* 261 U.S. 502, 43 S.Ct. 437, 67 L.Ed. 773 (1923)); *see also, Connolly v. Pension Benefit Guaranty Corp.,* 475 U.S. 211, 224, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986) (holding that regulation that nullified a provision in a private contract did not effect a taking as "the United States ha[d] taken nothing for its own use.").

Accordingly, because Plaintiffs had no legitimate expectation of continued entitlement to their franchise upon the condemnation of the Marketing Premises, and be-

---

**10.** These facts create a critical distinction between this case and *Armstrong v. United States,* 364 U.S. 40, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960), a case upon which Plaintiffs heavily rely. In *Armstrong,* petitioners possessed materialmen's liens on raw materials furnished to a contractor constructing boats pursuant to a contract with the United States. *Id.* at 41, 80 S.Ct. 1563. Upon the contractor's default, the government took possession of the materials acquired by the contractor thereby, because of the government's immunity, rendering the petitioners' liens valueless. In holding that the liens were property for which petitioners were entitled to compensation, the Supreme Court emphasized that, although the United States did not intend to destroy the value of the liens, it became the "direct, positive beneficiary" of their destruction, as it acquired the value of petitioners' raw materials without paying compensation. *Id.* at 49, 80 S.Ct. 1563. In contrast, in this case, the government received no benefit as a result of the termination of Plaintiffs' franchise. Indeed, Plaintiffs' franchise continued to have value after the DRPA's condemnation, and it was only after Tosco terminated the franchise that such value was lost. In such circumstances, the condemning authority need not bear the burden of paying compensation for interests that could have, but did not, survive the taking and from which it has received no benefit.

cause the DRPA did not obtain Plaintiffs' business as a going concern, but merely took possession of the land upon which that business was situated, the Court concludes that no compensable taking of Plaintiffs' franchise, or their franchised business, occurred in this case.

## IV.

For reasons articulated above, Defendant's Motion for Summary Judgment will be granted, and Plaintiffs' Motion for Partial Summary Judgment denied. The Court will issue an appropriate order.